**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 17, 2009

No. 08-10258

Charles R. Fulbruge III
Clerk

KEVIN SCOTT PETERSON

Plaintiff - Appellant

v.

CITY OF FORT WORTH, TEXAS

Defendant - Appellee

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before JONES, Chief Judge, JOLLY, Circuit Judge, and MONTALVO,[*] District
Judge.

E. GRADY JOLLY, Circuit Judge:

This case, brought as a § 1983 action, presents the question whether the
City of Fort Worth incurs municipal liability under *Monell v. Dep't of Social
Servs.* for the alleged excessive force of two of its police officers. *See* 436 U.S. 658
(1978). Kevin Peterson, who has alleged that he was seriously injured by Fort
Worth police officers during the course of an arrest, has not sued the officers
individually. Instead, he filed this action against the City of Fort Worth,
alleging that officers violated his Fourth Amendment rights by unlawfully

---

[*] United States District Judge, Western District of Texas, sitting by designation.

detaining him and using excessive force to restrain him. The City counters that the detention and force were reasonable under the Fourth Amendment, and that, in any event, it is not liable because Peterson cannot show that a policy, practice, or custom of the City was the moving force behind the violation. The district court granted summary judgment for the City, finding neither a violation nor municipal liability. We agree that the evidence does not support a claim of unlawful detention, but conclude there is sufficient evidence to establish excessive force. In short, if Peterson had sued the officers, he would have had a colorable claim. Nonetheless, he chose not to do so and because the evidence will not support municipal liability for the individual misconduct of the officers, summary judgment was proper and we affirm.

I.

We begin with a brief summary of the facts, stating them most favorably to Peterson.

On the night of August 14, 2005, Peterson and his wife Jodi joined some friends for a birthday party at Riscky's Bar-B-Que in Fort Worth's historic "Stockyards" district. They parked their extended-cab pick-up truck in a parking lot near an establishment called Billy Bob's Texas, the self-proclaimed world's largest honky-tonk. They had dinner at Riscky's Bar-B-Que and at about 10:00 p.m. walked over to a dance club, The Cantina Cadillac. There Peterson had six to eight beers; Jodi had three or four. They stayed until the club closed at 2:00 a.m. Because they were intoxicated, they decided not to drive home but to instead sleep in their truck. Peterson crawled into the back, and Jodi crawled into the front.

A Stockyards security guard later observed two persons sleeping in a truck near Billy Bob's Texas and called the Fort Worth Police Department. Officers Samantha Horner and Roger Ballard arrived at the scene at about 5:00 a.m. and there they found the Petersons sleeping.

2

Officer Horner tried to wake Peterson up. According to Officer Horner, she opened the unlocked rear door and shook Peterson's leg, but he did not respond. She then tapped her baton on Peterson's sternum; he kicked at her and told her to leave him alone. He began to doze, and she reached into the cab. He swatted at her, and she told him that she was a police officer and that he needed to get out of the truck. When he began to doze again, she grabbed his arm. Peterson then hit her on the forearm. Officer Horner alerted Officer Ballard that Peterson had hit her, and asked for his assistance in getting Peterson out of the truck.

Peterson testified that at this point he woke up. He recalled:

> The first thing I remember upon waking up was I was being drug out of the truck by my clothes. I was laying on my back. I actually hit the ground. The door was opened, and they drug me out. I was sliding on my back on the ground; and I had two police officers on me wrestling me to the ground . . . . And then they rolled me over and put my hands behind my back and put cuffs on me.

Peterson stated that after he was handcuffed the officers pulled him up by the cuffs' chain:

> They just jerked me up off the ground and . . . spun me around [and] slammed me up against the bed of the truck . . . . [T]here wasn't any struggle with me . . . .
>
> And then I noticed hey, these are cops . . . . I didn't say anything at that point.

According to Peterson, Officer Ballard was cursing at him when he delivered a hard knee strike to Peterson's thigh:

> The male officer was screaming in my ear. He was on my left, and he was saying you motherfucker. And he reared back and kneed me in the thigh with his knee . . . . [W]hen he did it, I cringed. I go ugh, . . . and I was

3

. . . immediately enraged because it was totally unnecessary for him to beat on me when I was in cuffs.[1]

Meanwhile, Jodi identified Peterson as her husband. At Officer Horner's instruction, Jodi remained seated in the cab.

Officer Ballard collected Peterson's billfold and license. After a background check produced no record, Officer Ballard uncuffed and released Peterson. Peterson stated that the whole time his leg was pounding.

The Petersons got back into their truck and waited until about 7:00 a.m. to drive home. When they got there, Peterson undressed and discovered that his leg needed medical treatment. At the hospital, doctors diagnosed him with a ruptured femoral artery. The injury required two surgeries and a hospital stay that lasted almost two weeks.

Peterson filed this § 1983 action against only the City of Fort Worth, choosing not to sue Officers Horner and Ballard, whom he alleged violated his Fourth Amendment rights by unlawfully detaining him and by using excessive force, specifically the knee strike, to restrain him. The district court concluded that the detention was lawful and that the force was not excessive under the circumstances. The district court also concluded that, even if the officers had violated Peterson's rights, the City was not liable because Peterson did not show that a policy, practice, or custom of the City was the moving force behind the officers' conduct. The district court entered summary judgment for the City, and Peterson appeals. For reasons we explain below, we find sufficient evidence to establish his excessive force claim. Nevertheless, because we conclude that the

---

[1] Officer Ballard denies that he cursed at Peterson and delivered a knee strike to Peterson's thigh. He stated that Peterson's resistance was minimal, and that a knee strike was unnecessary. Officer Horner, however, observed the knee strike and called it "an approved distraction technique." For the purposes of its motion for summary judgment, the City conceded that Officer Ballard delivered a knee strike to Peterson's thigh.

record evidence will not support municipal liability for the alleged misconduct of the individual officers, we affirm judgment for the City.

## II.

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *United States v. Corpus*, 491 F.3d 205, 209 (5th Cir. 2007). Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue as to any material fact exists, we must view the evidence in the light most favorable to the nonmoving party. *Corpus*, 491 F.3d at 209. The nonmoving party "must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 308 (5th Cir. 2004). The identified evidence "must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial." *Id.*

We address the threshold issue of whether officers violated Peterson's Fourth Amendment rights before we address the issue of municipal liability.

## III.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *See, e.g., Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)). The touchstone of the Fourth Amendment is thus reasonableness. *Id.* (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). We measure reasonableness "in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Peterson alleges that officers violated his Fourth Amendment rights by unlawfully detaining him and using excessive force to restrain him. Both unlawful detention and excessive force implicate the Fourth Amendment's proscription against unreasonable seizures. *See Terry v. Ohio*, 392 U.S. 1, 16 n.16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

A.

We first address the alleged unlawful detention.

Peterson argues the officers had no lawful justification for entering his truck and detaining him because they had no reasonable suspicion to believe he had committed a crime. He contends the officers acted on the mere "neutral facts" that the Petersons were parked near drinking establishments and were asleep in their vehicle. Peterson argues that those neutral facts did not support reasonable suspicion and, without it, the officers had no lawful justification for detaining him.

The City counters, and the district court held, that the officers' actions were reasonable in the light of their articulated concerns for the Petersons' safety. The City points to deposition testimony in which the officers stated that they were concerned for the Petersons' safety. Officer Horner testified that she tried to wake Peterson not because she suspected criminal activity but because "for his safety" she needed "to get compliance." Officer Ballard testified that they "didn't know if either one or two of them were simply intoxicated or had been hit in the head and left there, robbed."

We face here the kind of officer-citizen encounter that is controlled by *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court recognized that "[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute crime." *Id*. at 13. *Terry* itself addressed the kind of informal officer-citizen encounters that arise when

6

officers make on-the-spot observations that require immediate action. *Id*. at 20. In assessing the reasonableness of such actions, "there is 'no ready test.'" *Id*. at 21. Instead, a court must "'focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen.'" *Id*. at 20-21 (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 536-37 (1967)). The officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id*. at 21. The court then asks: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id*. at 22.

In other words, as we have previously stated: "We must attempt to put ourselves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context." *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc).

We agree with the district court that the detention was reasonable. The officers were responding to a call the Fort Worth Police Department received from a Stockyards security guard. The officers observed two persons, apparently unconscious, in a truck. It was early in the morning. The doors to the truck were unlocked. The persons were unresponsive to the officers' initial attempts to wake them. The officers had responsibilities for the persons' safety; it was not apparent whether the persons "were simply intoxicated or had been hit in the head and left there, robbed." The officers thus have pointed to "specific and articulable facts" that reasonably warranted their action. We think these facts clearly "warrant a man of reasonable caution in the belief" that the officers' actions were appropriate, and thus conclude this seizure was reasonable within the meaning of the Fourth Amendment. Accordingly, Peterson's detention was not unlawful.

B.

With respect to the excessive force claim, Peterson argues the knee strike used by Officer Ballard was unnecessary and excessive. He contends that at the time Officer Ballard delivered the knee strike to his thigh, Peterson was in full compliance with all police orders and was offering no resistance. Jodi was seated in the truck cab and Peterson himself was handcuffed. Of the moments leading up to the knee strike, Peterson testified:

> I can't recall putting up any resistance; but I was being attacked by two people. I didn't know they were police officers, because I just woke up when they drug me out of the truck. So I might have been – I know I was confused, and I didn't know why I was being attacked. . . . Is it possible I struggled? I don't see much – there wasn't much of a struggle from me . . . . It happened so fast there wasn't any time to struggle. I was rolled over on my stomach, and both officers had my arms behind my back; and they put cuffs on me . . . . And one of them, I believe it was the man, had his knee on my neck . . . . [A]nd both of them pried my arms behind my back with brute force and put cuffs on me. And one of them was sitting on my back, and the other one had his knee on my neck grinding my face . . . . I couldn't do anything. I don't think I struggled.

The City argues that Peterson was belligerent and the knee strike was necessary to restrain him. The City points to deposition testimony in which Officer Horner stated that Peterson kicked at her and hit her forearm when she first tried to wake him. Officer Ballard stated that outside of the truck Peterson struggled to escape his grasp. In Officer Ballard's words, Peterson "still continued to fail to comply. He wouldn't stand still. He was pulling away from us . . . . He [took] an aggressive stance toward us and [did] not [comply] to what we're asking him to do."

Our precedent requires that to establish a claim of excessive force, a plaintiff must show that, in addition to being seized, he suffered "(1) an injury

that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). There is no dispute that Peterson suffered an injury and, for purposes of its motion for summary judgment, the City conceded that Officer Ballard delivered a knee strike to Peterson's thigh. The question is whether that knee strike was excessive to the need and therefore objectively unreasonable. We determine whether the force was excessive "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Ballard*, 444 F.3d at 402.

The district court held that the knee strike was not excessive. The district court pointed out that the evidence showed that Peterson had been drinking, and that he hit Officer Horner on the forearm and resisted Officer Ballard's efforts to restrain him. The district court observed that Peterson's own testimony did not contradict the officers' testimony that Peterson had resisted compliance; Peterson stated that "there wasn't much of a struggle," but he did not deny resisting the officers.

We agree that the conflicting testimony does not rule out the possibility that some force may have been reasonable to restrain Peterson. But the evidence supporting the reasonableness of the police response is clearly disputed concerning whether continuing force in the form of a knee strike was justifiable *after* Peterson had been handcuffed. Peterson unequivocally testified that Officer Ballard did not strike him until after he had been handcuffed.

Nor does it escape our notice that the City conceded that Officer Ballard struck Peterson with his knee, yet Officer Ballard himself denied that he struck Peterson. Officer Ballard testified that Peterson resisted, but only minimally, such that a knee strike would have been unnecessary.

9

Thus, the existing evidence raises unresolved questions about what occurred. We therefore hold that the evidence creates a genuine issue of material fact as to whether, from the perspective of a reasonable officer on the scene, the knee strike was excessive and therefore objectively unreasonable. Summary judgment as to Peterson's excessive force claim was therefore improper.

IV.

The question now becomes whether summary judgment was nonetheless proper as to the City's liability for the alleged misconduct of its officers.

A.

We will begin with the basic principles of municipal liability for the misconduct of its employees in § 1983 actions.

It is well-established that a city is not liable under § 1983 on the theory of respondeat superior. *Monell,* 436 U.S. at 694; *Johnson*, 379 F.3d at 308. A municipality is almost never liable for an isolated unconstitutional act on the part of an employee; it is liable only for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Id.*

Official policy establishes culpability, and can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id*. at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Thus, a plaintiff must show the policy was promulgated by the municipality's policymaker. There is no "de facto" final policymaking authority. *See Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 616 n.2 (5th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988)). Here the parties agree that Chief Mendoza has final policymaking authority over the Fort Worth Police Department.

Finally, a plaintiff must establish that the policy was the moving force behind the violation. In other words, a plaintiff must show direct causation. *See Piotrowski*, 237 F.3d at 580. This means "there must be a direct causal link" between the policy and the violation. *Id.; see also Johnson*, 379 F.3d at 310 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) ("must be more than a mere 'but for'")).

Peterson acknowledges that there is no official written or otherwise specially articulated policy upon which he can rely. Nevertheless, he advances several theories of municipal liability. He alleges that the use of excessive force by Fort Worth Police Department officers is so common, and well known to the policymakers, that it constitutes a custom that fairly represents official policy. In addition, he alleges the City is also liable because it ratified the use of excessive force in this case and generally failed either to train or supervise its officers.

B.

Because we can quickly conclude that the City is not liable for any violation under the theories of ratification or failure to train or supervise, we address those arguments first.

11

Peterson alleges the City is liable because Chief Mendoza ratified the officers' conduct. He points out that Chief Mendoza determined after investigation that Officers Horner and Ballard's conduct complied with the department's policies. Peterson cites *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), which acknowledges that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127. But our precedent has limited the theory of ratification to "extreme factual situations." *See Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998). Under that precedent, we cannot say that this case presents an extreme factual situation. *Compare Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (finding ratification in case in which officers "poured" gunfire onto a truck and killed innocent occupant), *with Snyder*, 142 F.3d at 798 (refusing to find ratification in case in which officer shot fleeing suspect in the back). Moreover, we have also explained that a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality. *See Coon v. Ledbetter*, 780 F.2d 1158, 1161-62 (5th Cir. 1986) (precedent "does *not* stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy"). Our precedent thus forecloses ratification liability in this case.[2]

---

[2] The dissent acknowledges that ratification is "seldom, if ever, found by this court." It maintains, however, that Peterson put forth evidence of ratification sufficient to withstand summary judgment by showing that neither Officer Ballard nor Officer Horner was disciplined for the use of force or failure to file a "Use of Force Report" following the incident, and by pointing to Chief Mendoza's deposition testimony that both officers complied with the City's policies and procedures. However, this evidence, viewed in the light most favorable to Peterson, is insufficient to create a fact issue regarding the City's policymaker's ratification of unconstitutional conduct. In *City of St. Louis v. Praprotnik*, a case on which Peterson relies, the Supreme Court emphasized that "[s]imply going along with discretionary decisions made

Peterson also alleges that the City was deliberately indifferent to the obvious need for training on the risk of injuries from knee strikes. He points to Officer Ballard's testimony that he did not "recall being told that there was any risk of injury from a knee strike" nor that training "may have made a difference" in his evaluation of the use of force. The failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement. *See Brown v. Bryan Co., Okla.*, 219 F.3d 450, 458 (5th Cir. 2000). "[U]nder certain circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations." *Id.* at 459. But those circumstances are not present here. We have previously held that to hold a municipality liable for failure to train an officer, it must have been obvious that "the highly predictable consequence of not training" its officers was that they "would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." *Id.* at 461. Peterson points to no evidence that the City was aware of any risk of injury from knee strikes, and the City showed that officers otherwise go through extensive training on the use of force. Particularly in the absence of evidence that the use of knee strikes had caused serious injuries on previous occasions, Peterson has

by one's subordinates, however, is not a delegation to them of the authority to make policy . . . ." 485 U.S. 112, 130 (1988). Additionally, "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority . . . ." *Id. See also Kibbe v. City of Springfield*, 777 F.2d 801, 809 n.7 (1st Cir. 1985) ("The [district] court suggested that the City had ratified defendant Perry's action by clearing him and finding that he had acted in accordance with the police department's policies. We are unconvinced that a failure to discipline Perry or other officers amounts to the sort of ratification from which a jury properly could infer municipal policy.").

The dissent also acknowledges that ratification applies only in "extreme factual situations." It maintains, however, that our conclusion that this was not an "extreme factual situation" is a "factual determination," which we are not permitted to make. On the contrary, our conclusion rests on a legal determination that the facts here, even viewed in the light most favorable to Peterson, do not satisfy the legal standard set out in our ratification caselaw.

presented no material fact question to show that it should have been *obvious* to the policymakers that the risk of serious injury was a "highly predictable consequence" of the failure to train. *See Estate of Davis ex rel. McCully v. City of North Richmond Hills*, 406 F.3d 375, 383, 386 (5th Cir. 2005) (deliberate indifference usually requires "'at least a pattern of similar incidents in which the citizens were injured'" (citation omitted), and "narrow" single incident exception has applied when the court finds a complete failure to train, not just a failure to train in "one limited area").[3]

In a similar vein, Peterson alleges the City was deliberately indifferent to the need to supervise its officers adequately. Again, for the City to be liable for failure to supervise, it at least must have been obvious that "the highly predictable consequence" of not supervising its officers was that they "would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." *Id.* at 461. As an example of the department's failure to supervise, Peterson points to the fact that Officer Horner failed to fill out a use of force report, in violation of department policy, after she witnessed Officer Ballard use force on Peterson. Even assuming this to be true, however, the department did demonstrate some supervision by conducting a thorough internal affairs investigation into the incident and into a possible misstatement made in Officer Horner's activity report. The department's failure to reprimand one officer for

---

[3] Though the evidence cited by the dissent may create a factual dispute as to whether the City's police officers received sufficient training on the practice and consequences of knee strikes, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city . . . ." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Rather, the "vigorous test" of "deliberate indifference," *Brown*, 219 F.3d at 461, is required because a "lesser standard of fault would result in *de facto respondeat superior* liability on municipalities–a result [the Supreme Court] rejected in *Monell*." *Canton*, 489 U.S. at 392. Here, no reasonable jury could conclude that a risk of injury to citizens was the "obvious," "highly predictable consequence" of a lack of knee strike training, as Peterson has not shown that the City had "sufficient notice" that knee strikes were frequently used, particularly dangerous, or had previously resulted in injury, much less an injury of the type experienced by Peterson. *Brown*, 219 F.3d at 458.

an instance of faulty recordkeeping would not alone raise a genuine issue of material fact on whether the obvious and "highly predictable consequence" of the department's actions was that citizens' Fourth Amendment rights would be violated, and Peterson has otherwise provided no evidence of inadequate supervision. We find no evidentiary support to submit municipal liability to the jury on the theory that the department failed to supervise its officers.

Accordingly, the district court properly held on summary judgment that the City is not liable for any violation under the theories of ratification or failure to train or supervise.

## C.

Finally, we address whether Peterson has presented sufficient evidence to establish a fact question for municipal liability on the basis that the City maintained an official policy that was permissive of excessive force. As we have stated, Peterson must show some evidence to support that an official policy of the City was the moving force behind the excessive force that violated his Fourth Amendment rights. *Piotrowski*, 237 F.3d at 578. He concedes that there is no written policy supporting his claim of municipal liability. Instead he argues that a pattern of excessive force in making arrests establishes that the City maintained an unwritten policy that was permissive of the use of excessive force. In support, he points to 27 complaints of excessive force between 2002 and 2005. The legal question thus presented is whether the 27 complaints on which Peterson relies are sufficient to establish a pattern of excessive force that can be said to represent official policy.

A pattern is tantamount to official policy when it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id*. at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the

attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster*, 735 F.2d at 842. It is thus clear that a plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582 (citations omitted). A pattern requires similarity and specificity; "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

A pattern also requires "sufficiently numerous prior incidents," as opposed to "isolated instances." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989). In *Pineda v. City of Houston,* 291 F.3d 325 (5th Cir. 2002), we held that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry. In each of those eleven incidents, officers reported either consent or exigent circumstances. *Id.* at 329 n.12. We observed that "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces." *Id.* at 329.

The district court, relying on *Pineda*, held that the 27 complaints on which Peterson relies were insufficient to establish a pattern of excessive force. After careful examination of the record, we conclude the district court did not err.

Peterson presented evidence that, according to the City's internal affairs records, at least 27 complaints of excessive force were filed between 2002 and 2005. Almost all arose from officers' investigations of what may be called small crimes; the injuries suffered, however, ranged from minor lacerations to broken bones. In one incident, officers allegedly stopped a suspect who was riding a bicycle and, after he had dismounted the bicycle and lay on the ground, beat him until his face bled and his nose and eye socket were fractured. In another incident, an officer who detained an individual as a suspect in the burglary of a

16

car wash knee-struck him in the back and broke his jaw; that individual turned out to be, not a suspect, but one of the car wash's owners. In yet another incident, officers allegedly punched and beat a suspect until he suffered a head injury; although the officers claimed that the suspect was carrying a crack pipe, they were unable to produce the pipe. And finally, in an even more alarming incident, officers responding to a call alleging tampering with an electrical box entered an apartment without a warrant and allegedly tased an individual until he was unconscious and had stopped breathing.

The incidents allege use of force that, if true, would be emphatically excessive. Nevertheless, assuming their truth, the incidents do not, on the basis of this record, tell us that the City maintained an official policy of condoning excessive force. The failure of the evidence is that the plaintiffs have failed to provide context that would show a pattern of establishing a municipal policy.[4] For example, the record does not indicate the size of the Fort Worth Police Department or how many arrests were made by the department between 2002 and 2005. We have previously indicated that the size of a police department may be relevant to determining whether a series of incidents can be called a pattern. *Pineda*, 291 F.3d at 329 ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."). Although the record omits any evidence of the department's size or the number of its arrests, the department's own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of

---

[4] Twenty-seven incidents in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy. The burden of providing a context that would show such a pattern falls on the plaintiff, not on the City, and Peterson has failed to meet that burden. No reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force.

crime in the last year alone. Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*. *See* 436 U.S. at 694.

The record does indicate that for each of the 27 complaints of excessive force the department conducted an internal investigation, a fact that would appear to cut against the argument that the City condoned the use of excessive force. The City itself has relied on the fact that only four of the 27 complaints were "sustained" after investigation and, indeed, in each of the incidents described above, the department found the complaint of excessive force either "not sustained" or "unfounded." However, that the department itself vaguely ruled most of its complaints "not sustained" or "unfounded" is no assurance that these investigations exonerate the City. To the contrary, that only four of the 27 complaints were "sustained" after investigation may tilt in Peterson's favor. Nevertheless, even assuming error in the unsustained investigations, the record as a whole will not support a legal conclusion that the City maintained an official policy of condoning excessive force.

In sum, the 27 incidents, in the context of this record, do not suggest a pattern "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579.

## V.

In conclusion, there was sufficient evidence to establish Peterson's excessive force claim. Peterson, however, did not sue the officer or officers who violated his constitutional rights. Instead he sought to impose liability on the City of Fort Worth for the misconduct of its employees. In this connection, he

failed to produce evidence to satisfy the demanding standards required by *Monell* and its progeny to hold the City liable, all for the reasons we have detailed in this opinion. Accordingly, the judgment of the district court is

AFFIRMED.

MONTALVO,[*****] District Judge, concurring in part and dissenting in part.

At issue on review is whether Peterson met his burden, as the non-moving party to the City's summary judgment motion, of showing a dispute of material fact concerning his claims. The majority properly sets forth the standard of review on summary judgment, noting it should apply the same legal standard that the district court applied. I CONCUR with the findings in Part III of majority opinion, *supra*, that Peterson's seizure was reasonable within the meaning of the Fourth Amendment and therefore lawful, but that the evidence creates a genuine issue of material fact as to whether the knee strike was excessive and therefore objectively unreasonable, from the perspective of a reasonable officer on the scene.

However, with regards to the City's summary judgment motion as to municipal liability in Part IV of the majority opinion, *supra*, I believe the majority holds Peterson to a higher standard than the law requires. Accordingly, I respectfully DISSENT as to the majority's finding there is no genuine issue of fact for trial concerning municipal liability.

## I.

The court's task is to review the evidence and resolve all reasonable doubts and inferences *in a light most favorable to Peterson*, as the non-moving party. *Richardson v. Oldham*, 12 F.3d 1373, 1381-82 (5th Cir. 1994); *McKee v. City of Rockwall, Tex.*, 877 F.2d 409, 410 (5th Cir. 1989). Peterson only needs to present "some evidence of . . . a policy in order to survive the [City's] summary judgment motion." *See McKee*, 877 F.2d at 414-15. That is, Peterson need only present sufficient evidence to show there is a dispute of fact regarding the City police department's policy on use of force "that a reasonable jury could return a verdict for the nonmoving party." *Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th

---

[*****] United States District Judge, Western District of Texas, sitting by designation.

Cir. 1992). Accordingly, such evidence must have probative weight. *See McKee*, 877 F.2d at 415. Nonetheless, only "*a complete failure of proof* concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 414-15 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)) (emphasis added). This court has made clear: "[c]redibility determinations have no place in summary judgment proceedings." *Richardson*, 12 F.3d at 1381-82.

## II.

## A.

In the first instance, the majority summarily dismisses Peterson's argument and the evidence concerning liability based upon a theory of ratification. The majority states a theory of ratification depends upon "extreme factual situations," but does not explain how it reached the determination that Peterson failed to present an extreme factual situation, given the existing disputes of material fact.

Evidence on this issue included 1) Chief Mendoza's deposition testimony, in which he states both Officer Ballard and Officer Horner acted in conformity with the City's policies and procedures; and in which he states if there is no discipline for excessive force, the lack of discipline could be construed as tacit approval of the use of force; 2) Officer Horner's deposition testimony, in which she states she believes she saw Officer Ballard knee strike Peterson; and 3) Officer Ballard's deposition testimony that a knee strike against Peterson would have been excessive force because Peterson was under control; not a threat; and not engaged in any behavior that justified a knee strike.

The City argues it is not liable under a theory of ratification because the officers were faced with an aggressively resisting individual and offers its written policies in support.

21

The district court's dismissal of this basis for municipal liability, and the majority's summary affirmance of that decision, is problematic based upon the applicable burdens of proof for the respective parties. As the non-moving party, Peterson's burden of proof at summary judgment is sufficient evidence, which creates a dispute of material fact. *See Fraire*, 957 F.2d at 1273. It is true that ratification is seldom, if ever, found by this court. As the majority points out, a policymaker who defends conduct later shown to be unlawful does not necessarily incur liability on behalf of the municipality; nonetheless, this does not foreclose the possibility that the municipality *may* incur liability. "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988).

The majority distinguishes between the instances in which the court has permitted a party to succeed on a theory of ratification, and this case, noting this is not an "extreme factual situation." Even though there is a dispute of facts concerning what exactly occurred between Officers Ballard and Horner and Peterson, the majority holds the factual situation is not extreme enough for a theory of ratification to apply. The majority is making a factual determination. It is *for the jury* to make factual and credibility determinations. *See Richardson*, 12 F.3d at 1381-82.

Here, Peterson showed: at least two people, he and Officer Horner, believed Officer Ballard performed a knee strike; Officer Ballard did not believe a knee strike was warranted under the circumstances; and neither officer was disciplined for the incident, despite the department's policy that when an officer uses force or sees another officer use force, a Use of Force report is to be filled out.

City of Forth Worth Police Department General Order 306.09 requires "any use of force incident during which the level of force used was hard open-hand control and restraint or greater shall be reported and identified as 'Use of Force by an Officer.'" The General Order specifically directs an officer to "report the full details of the use of force in related arrests or offense reports. If no arrest or offense report is to be completed, the details shall be reported in an incident report."

At the time of completing the Use of Force report, "[a] separate inter-office correspondence will be completed by the supervisor and forwarded through the officer's chain of command to be reviewed and filed by the bureau." These reports are supposed to be completed at the end of an officer's watch and are to be entitled "Use of Force" and routed to the captain for management review. The captains are charged with reviewing the Use of Force reports "to determine if there is a need for changes in departmental procedures or *additional training* for the officer" (emphasis added).

Officer Horner testified she saw Officer Ballard use force – a knee strike – which, according to the City's evidence, is hard open-hand control. Yet, she never filled out a Use of Force report. When it was discovered she never filled out a Use of Report, she was not disciplined for this failure. Chief Mendoza described Officer Horner's failure to fill out the Use of Force report as "ancillary" to the investigation of Peterson's allegations. This is problematic for several reasons.

According to evidence presented by the City, such Use of Force reports eventually are supposed to be forwarded to the Training Division for review. According to General Order 306.10, a Training Division captain is tasked with ensuring appropriate training is developed and offered annually. If the police department is not enforcing the self-reporting of use of force, despite the fact that they have an officer who states she believes she saw force used, it is

essentially condoning the failure to report. This, in turn, ensures there will *never* be an assessment of whether training on excessive force should be conducted with greater regularity or in a different manner. Coupling these circumstances with the Defensive Tactics Manual of the Fort Worth Police Academy's maxim, "If it makes you look good, but it's not in your report, it didn't happen," there appears to be a tacit understanding that if an officer does not raise the issue, he or she may avoid it all together.

The district court attempted to address the issue of Officer Horner's failure to report the use of force when it dealt with Peterson's failure to supervise argument. The district court stated the Internal Affairs investigation dealt with the deficiency and relied on Sergeant Decker's admonition to Officer Horner to be more diligent in the accurate documentation of her work product. Unfortunately, the district court was mistaken as to why Officer Horner was admonished.

The Internal Affairs investigation dealt with the falsification of Officer Horner's worksheet, including her notations regarding whether Peterson drove away after the encounter. This additional allegation of falsifying her worksheet, which was added during the course of the Internal Affairs investigation, was actually a recrimination against her mistake regarding whether Peterson stayed at the scene, left the scene, or called a friend. It had nothing to do with Officer Horner's failure to report Officer Ballard's use of force. If anything, the admonition looks more like an unscrupulous tactic meant to strong-arm a rookie officer into changing her statement by turning up the heat on her.[1]

Drawing all reasonable inferences in favor of Peterson based upon the evidence presented, Peterson has created a question of fact to be submitted to the jury regarding ratification. The City offers no evidence that renders all

---

[1] Officer Horner received her commission as a Fort Worth Police Officer in December 2004, approximately nine months prior to the alleged incident.

material facts indisputable. Defeating a summary judgment motion only requires the non-moving party to present sufficient evidence, which creates a dispute of material fact. Because there is sufficient evidence to create a dispute of material fact, I believe the issue of ratification should be submitted to the jury.

## B.

The majority correctly points out municipal liability can be based upon a failure to train if there is deliberate indifference to an obvious need for training, which could impair citizens' constitutional rights. The majority sets forth that municipal liability on a failure to train theory requires that it be obvious that "the highly predictable consequence of not training" its officers was that they "would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." *Brown v. Bryan Co., Okla.*, 219 F.3d 450, 461 (5th Cir. 2000). The majority asserts that Peterson points to no evidence that the City was aware of any risk of injury to knee strikes, and instead relies on to the City's contention it conducts extensive training on the use of force. The majority concludes Peterson has failed to present a question of material fact concerning whether it was or "should have been *obvious* to the policy makers that the risk of injury was a 'highly predictable consequence' of the failure to train."

Again, the majority imposes a burden on Peterson, which exceeds what the law requires of him. Peterson need only present sufficient evidence, which creates a dispute of fact concerning the City's failure to train. In evidence are:

1) Officer Horner's deposition testimony in which she stated she could not recall training about the adequate use of force for a given set of circumstances;

2) Officer Ballard's deposition testimony, in which he could not recall receiving training on differences between passive and active resistance in relation to the amount of force used; in which he stated

25

an officer cannot evaluate risk of injury if there is no training; in which he stated he could not recall being told there was a risk of injury when using a knee strike; in which he stated he was written up previously for tasering an individual, who was handcuffed, but he was not told why the act was dangerous; in which he stated he was never retrained on the use of tasers; and in which he stated if he had knowledge regarding risk of using knee strikes, it would make a difference in his calculation of use of force;

3) Chief Mendoza's deposition testimony, in which he stated he was the overall authority for training and approving training policies of the department; in which he stated an officer is less likely to hit a person in a place that will cause more damage if they understand the reasons for doing so; and in which he stated continuing education does not include training on knee strikes, to his knowledge;

4) Records reflecting allegations of excessive force;

5) A summary chart, detailing allegations of excessive force;

6) Reports of the chain of command;

7) An affidavit of an instructor at the police academy, which states the City provides training in use of force at the police academy and subsequently every twenty-four months, in the form of continuing education, which exceed the minimum training requirements imposed by the state;

8) Officer Horner's training record; and

9) Officer Ballard's training record.

In reviewing this evidence, the court's task is only to determine whether there is a factual dispute regarding the City's failure to train. The evidence shows officers undergo preliminary training at the police academy, which

26

includes use of force training, and continuing education training on use of force. Executive Chief Deputy Kneblick's affidavit states each police officer is trained in the application of the General Orders, which includes a General Order on the use of force, and is required to comply with the General Orders.

The more disconcerting pieces of evidence offered by the City, however, are Officer Horner's and Officer Ballard's training records. While Officer Horner's record shows she received continuing education on the use of force, Officer Ballard's record reveals he has not. Peterson has shown through Officer Ballard's testimony that he was disciplined on a prior occasion for using a taser on a handcuffed individual. Officer Ballard's training record does *not* reflect any retraining on use of a taser, despite his inappropriate prior use. More critically, since the time Officer Ballard joined the police department, he has *never* taken a course directed specifically at the use of force, according to his training record.

Peterson contends his showing that neither officer could remember whether they received use of force training demonstrates the training is inadequate. Chief Mendoza testified he did not know how often knee-strike training occurred. While both Officers Ballard and Horner testified they were taught the distractionary technique of the knee strike, neither was taught the possible physical consequences of using such a strike. Chief Mendoza, the overall authority for approving training and the content of the Defensive Tactics Manual, testified that training concentrated on *where* to strike, rather than the *repercussions* of striking an individual in a particular place. He stated training probably covered that "a little bit." He agreed during his deposition testimony that an officer would be less likely to strike in a place that would cause serious damage if the officer knew the consequences, and he conceded the type of injury Peterson received could result from a knee strike.

When this evidence is viewed in light of the previous discussion concerning the Use of Force reports, see *supra* Part II.A of this dissent,[2] reasonable minds could infer a failure to train and deliberate indifference. The policymaker, Chief Mendoza, is hardly concerned with training officers on the *potential* for harm. It is axiomatic that if an officer does not know the risk of injury in applying a knee strike, there is no way he can appropriately assess when to use it based upon the totality of the circumstances. This would be true of any of the use of force techniques because officers receive no training on the repercussions of using such techniques, as Chief Mendoza testified. Hence, it is clear Peterson has created a dispute of material fact regarding the City's failure to adequately train its officers sufficient to submit to a jury.

## C.

Finally, the majority addresses Peterson's argument the City has a custom, as evidenced by a persistent, widespread pattern of excessive force during investigations of "mild crimes," to which the police department's chain of command acquiesces by citing officers for lesser offenses, exonerating them for use of force, and only mildly disciplining officers who are found to have used excessive force, which amounts to tacit approval of the use of excessive force.

To demonstrate the existence of a custom or policy, Peterson presents the following evidence:

1) Chief Mendoza's deposition testimony, in which he states allegations of officers' use of excessive force in the field should be

---

[2] The majority's assertion that the department's failure to reprimand Officer Horner for "an instance of faulty recordkeeping" does not raise a genuine issue of material fact on whether the obvious and "highly predictable consequences" of this failure would lead to the violation of citizens' Fourth Amendment rights ignores the purpose of the process of reporting the use of force. The express purpose of the Use of Force reports is "to determine if there is a need for changes in departmental procedures or additional training for the officer." If the department does not enforce the reporting requirement, it essentially bypasses the procedure meant to inform it of what, if any, use of force training is necessary to ensure citizens' constitutional rights are not violated.

investigated; in which he states making an allegation of excessive force against other officers is a defensive measure to defend oneself and, ultimately, the officer may not be willing to come forward; in which he states he is the ultimate disciplinarian; in which he states a police officer may use force to effectuate an arrest/detention even if there is no legal basis for the arrest/detention (which the district court said was only an opinion and does not affect official policy); in which he discusses an incident where officers illegally entered an apartment and tasered an individual in the closet covered with a black trash bag three to four times until he was unconscious and concludes it was not excessive force;

2) A summary chart which shows 27 allegations of excessive force over a five-year period, which were actually investigated by Internal Affairs–where only four complaints were sustained;

3) An interview of a third-party witness, who saw police chase down a man on a bicycle and beat him until his face bled–where the charge of excessive force was not sustained against one officer and unfounded for others;

4) An interoffice correspondence from Executive Deputy Chief Kneblick, reversing a finding of "not sustained" by the rest of the chain of command, in one incident where an off-duty officer struck two individuals on the backs of their heads with his gun; and

5) A summary statement, where a police officer knee-struck a man who was laying on the ground because he tensed, even though the man was actually the owner of the car wash where the police officer was investigating a burglary, which resulted in the officer breaking the owner's nose–the allegations of excessive force were deemed unfounded.

Peterson contends these allegations put the City on notice that there is an issue with its officers using excessive force and it is so common and well-settled that it represents a policy, which is tacitly condoned by the chain of command, up through the Chief of Police.

To demonstrate the City has a policy which expressly denounces the use of force, the City offers the following evidence:

1) General Orders regarding the use of excessive force;

2) An affidavit of Executive Deputy Chief Kneblick, who states the General Orders are provided to all police officers of the police department regarding the use of force, and the police department supports this policy through training and discipline;

3) The claim there is no evidence the police department officials acquiesced to excessive force;

4) The City conducted a rigorous investigation of Peterson's complaint; and

5) Peterson's summary chart, which showed 4 findings of excessive force, no discipline in 18 investigations, and 1 case, which involved the use of a knee strike.

The majority initially couches the inquiry as "whether Peterson has presented sufficient evidence to establish a fact question for municipal liability on the basis that the City maintained an official policy that was permissive of excessive force." In the next instance, however, the majority couches the inquiry as a question of law, suggesting "[t]he legal question thus presented is whether the 27 complaints on which Peterson relies are sufficient to establish a pattern of excessive force that can be said to represent official policy."

It is not our duty to address the latter question. The appropriate question is whether Peterson has presented sufficient evidence to create a dispute of material fact about the existence of a widespread pattern of excessive force

condoned by the City. The Supreme Court made clear that "[o]nce those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 2724 (1989) (citations omitted). It is for the jury now to determine whether 27 instances of excessive force allegations are reflective of a standing operating procedure that may have caused the deprivation of Peterson's rights.

The majority, like the district court, relies on this court's decision in *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002), and concludes 27 complaints of excessive force are insufficient to establish a pattern of use of excessive force. It points out that in *Pineda* 11 incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry because the officers in the 11 incidents reported either consent or exigent circumstances, which was equivocal evidence of Fourth Amendment compliance.

The facts and circumstances in *Pineda* are readily distinguishable. First, in *Pineda*, 291 F.3d at 328, the plaintiff alleged the City of Houston had a custom of permitting warrantless searches of residences. Peterson's alleged custom is much narrower: the use of excessive force in violation of the Fourth Amendment during investigations of "mild crimes," to which the police department's chain of command acquiesces by citing officers for lesser offenses, exonerating them for use of force, and only mildly disciplining officers who are found to have used excessive force, which amounts to tacit approval of the use of excessive force. Unlike in *Pineda*, where the alleged municipal custom would apply to all warrantless searches in any instance, Peterson's alleged custom focuses on minor crimes, where the chain-of-command ultimately exonerates or

finds the claim unsustained or issues only mild discipline when the claim is founded.

Second, Peterson's proffer of evidence concerning the use of excessive force as a City custom consists of more than double the number of quantifiable allegations than were offered in *Pineda*. In *Pineda*, the court reviewed the proffer of 11 alleged incidents, which occurred over a period of more than six years "in one of the Nation's largest cities and police forces." *See id*. at 329, 331 n.24. Here, Peterson relied on hundreds of pages of reports, which he condensed into his Summary Chart, over a period from 2001 to 2005.[3] This court opined in *Pineda*, however, that relying on previous offense reports could lead to the "practical effect" of "requir[ing] the City to defend 'cases within cases.'" *Id*. at 329. While that may be a "practical effect" sometimes, it is not necessarily the case here.

Here, Peterson alleges not simply that these allegations show a custom of permitting the use of excessive force. Rather, Peterson contends these allegations, gleaned from the numerous reports he examined, show the City had notice of such violations, which were reviewed by the chain-of-command, evincing a flawed system by which various police officers at different levels of the chain-of-command could not or did not agree on whether excessive force was used, which has led to the acquiescence or condonation of the use of excessive force. Foreclosing the use of such evidence, which might show to the trier of fact that the City has notice of a problem and chooses to look the other way, essentially forecloses municipal liability on a theory of "custom." This is certainly not the result portended by *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

---

[3] Two incidents described in the summary chart occurred in 2007.

Third, this case is distinguishable from *Pineda* because in addition to producing a quantifiably greater number of incidents[4] to establish the alleged custom, Peterson offers the police department's own maxim: "If it makes you look good, but it's not in your report, it didn't happen." The City's police officers are taught this idea at the police academy. The obvious corollary is "if something is not reported, it will not impact you [the officer]." The circumstances of *Pineda* do not evidence a similar understanding of withholding information for the purpose of avoiding reprimand or investigation.

Finally, Peterson offers the testimony of Chief Mendoza, who conceded he was the ultimate disciplinarian for police officers in the police department. The district court determined the City did not have a policy permitting the use of excessive force in part based on Chief Mendoza's testimony, when he stated: "I don't believe officers can use force against people without . . . there being some reasonable suspicion or probable cause that a crime has been committed or is about to be committed." However, subsequent to stating this opinion, Chief Mendoza readily stated a police officer may legally use force *even if* a police officer does not have a legal right to enter a private residence and make an arrest.

The Record reflects the following exchange between Peterson's counsel and Chief Mendoza during deposition:

---

[4] Such a distinction is made without considering the relative size of the respective cities and police forces. Obviously, the fact that 27 incidents occurred in a smaller city with a smaller police department undermines the efficacy of relying on *Pineda*.

The majority's suggestion "[n]o reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force" is undercut by the very fact that this panel has split on the issue of whether Peterson established a question of fact concerning municipal liability for purposes of withstanding summary judgment. "Indeed, the fact that reasonable judges on this court view the evidence differently suggests that these factual disputes [a]re for the jury to resolve." *Thompson v. Connick*, 578 F.3d 293, 314 (5th Cir. 2009) (en banc) (Prado, J., joining).

Q. (By Ms. Hutchinson) If they didn't have the legal right to be in the apartment and they didn't have the legal right to make an arrest, then they also didn't have the legal right to use force, correct?

A. No, ma'am.

Q. That's not correct?

A. That's not correct.

The district court dismissed this particular comment as Chief Mendoza's opinion.

Whether Chief Mendoza actually believes the former or the latter of his statements are factual and credibility determinations for the jury. The latter commentary could be construed as the police department policymaker's interpretation of the law on the use of reasonable force.

In *Pineda* there is no indication the chief of police made a statement that resembled the content of Chief Mendoza's statement. A reasonable jury *could* return a verdict in favor of Peterson if it were to find, as a matter of fact, Chief Mendoza believes his latter interpretation of the law complies with the strictures of the Fourth Amendment and he acts in his capacity as chief of the police department on that belief when he reviews excessive force claims. *See Fraire*, 957 F.2d at 1273 ("A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (footnote omitted).

The majority further relies on dicta from *Pineda*, in which this court stated the size of a police department may be relevant to determining whether a series of incidents can be called a pattern. While this guidance from *Pineda* could be helpful in this case, the fact is there is no evidence in the Record concerning the size of the City's police department. In the City's brief on appeal, it merely argues there were numerous arrests and detentions made over a five-year period. The closest the City comes to revealing how many officers are in its

police department is when it stated in its reply in the district court that there were "hundreds of thousands of arrests and detentions made over a five year period by over one thousand (1000) police officers employed by the City." However, the City offered nothing for the Record to support this blanket contention. The absence of any statistical evidence in the Record leaves genuine issues for trial. The number of incidents Peterson offers could be the highest or lowest in cities of a comparable size.

The majority nonetheless concludes the City has demonstrated no genuine issues of material fact regarding a custom condoning the use of excessive force because the majority augments the Record by undertaking its own data search on the City's website.[5] The majority has essentially done what the City should have endeavored to do in moving for summary judgment and did not do. This is not the court's duty.

The court's task is to review whether Peterson has presented sufficient evidence, not all possible evidence, to create a dispute of material fact concerning whether the City has a custom of condoning excessive force, despite the City's written policies denouncing excessive force. The Record shows 27 allegations of the use of excessive force, which largely were unsustained by a policymaker who believes a police officer may use force to effectuate an arrest/detention, even if there is no legal basis for the arrest/detention. Most critically, the City failed to offer any competent evidence to demonstrate what those 27 incidents mean in light of the number of citizen encounters for a city of comparable size. Hence,

---

[5] The majority's review of the City's website presented the following evidence: "[The City] presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone." This led the majority to conclude: "[g]iven the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct." A conclusion based upon evidence not in the Record is simply insufficient to affirm the district court's grant of summary judgment.

there remains a dispute of fact regarding whether the City has a custom of condoning excessive force.

## III.

Peterson has presented sufficient evidence to create a dispute of fact regarding whether the City can be held liable on theories of ratification, a failure to train, and a custom of condoning excessive force. Because it is the court's duty to review whether, in resolving all doubts and inferences in a light most favorable to the nonmoving party, Peterson has presented sufficient evidence to create a dispute of material fact regarding the existence of a policy, the district court's decision should be REVERSED, and this case should be REMANDED for trial.