MONTALVO, District Judge,
concurring in part and dissenting in part:
At issue on review is whether Peterson met his burden, as the non-moving party to the City’s summary judgment motion, of showing a dispute of material fact concerning his claims. The majority properly sets forth the standard of review on summary judgment, noting it should apply the same legal standard that the district court applied. I CONCUR with the findings in Part III of majority opinion, supra, that Peterson’s seizure was reasonable within the meaning of the Fourth Amendment and therefore lawful, but that the evidence creates a genuine issue of material fact as to whether the knee strike was excessive and therefore objectively unreasonable, from the perspective of a reasonable officer on the scene.
*853 However, with regards to the City’s summary judgment motion as to municipal liability in Part IV of the majority opinion, supra, I believe the majority holds Peterson to a higher standard than the law requires. Accordingly, I respectfully DISSENT as to the majority’s finding there is no genuine issue of fact for trial concerning municipal liability.
I.
The court’s task is to review the evidence and resolve all reasonable doubts and inferences in a light most favorable to Peterson, as the non-moving party. Richardson v. Oldham, 12 F.3d 1373, 1381-82 (5th Cir.1994); McKee v. City of Rockwall, Tex., 877 F.2d 409, 410 (5th Cir.1989). Peterson only needs to present “some evidence of ... a policy in order to survive the [City’s] summary judgment motion.” See McKee, 877 F.2d at 414-15. That is, Peterson need only present sufficient evidence to show there is a dispute of fact regarding the City police department’s policy on use of force “that a reasonable jury could return a verdict for the nonmoving party.” Fraire v. City of Arlington, 957 F.2d 1268, 1273 (5th Cir.1992). Accordingly, such evidence must have probative weight. See McKee, 877 F.2d at 415. Nonetheless, only “a complete failure of proof concerning an essential element of the nonmoving party’s case necessarily renders all other facts immaterial.” Id. at 414-15 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)) (emphasis added). This court has made clear: “[credibility determinations have no place in summary judgment proceedings.” Richardson, 12 F.3d at 1381-82.
II.
A.
In the first instance, the majority summarily dismisses Peterson’s argument and the evidence concerning liability based upon a theory of ratification. The majority states a theory of ratification depends upon “extreme factual situations,” but does not explain how it reached the determination that Peterson failed to present an extreme factual situation, given the existing disputes of material fact.
Evidence on this issue included 1) Chief Mendoza’s deposition testimony, in which he states both Officer Ballard and Officer Horner acted in conformity with the City’s policies and procedures; and in which he states if there is no discipline for excessive force, the lack of discipline could be construed as tacit approval of the use of force; 2) Officer Horner’s deposition testimony, in which she states she believes she saw Officer Ballard knee strike Peterson; and 3) Officer Ballard’s deposition testimony that a knee strike against Peterson would have been excessive force because Peterson was under control; not a threat; and not engaged in any behavior that justified a knee strike.
The City argues it is not liable under a theory of ratification because the officers were faced with an aggressively resisting individual and offers its written policies in support.
The district court’s dismissal of this basis for municipal liability, and the majority’s summary affirmance of that decision, is problematic based upon the applicable burdens of proof for the respective parties. As the non-moving party, Peterson’s burden of proof at summary judgment is sufficient evidence, which creates a dispute of material fact. See Fraire, 957 F.2d at 1273. It is true that ratification is seldom, if ever, found by this court. As the majority points out, a policymaker who defends conduct later shown to be unlawful does not necessarily incur liability on behalf of *854 the municipality; nonetheless, this does not foreclose the possibility that the municipality may incur liability. “If the authorized policymakers approve a subordinate’s decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.” City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).
The majority distinguishes between the instances in which the court has permitted a party to succeed on a theory of ratification, and this case, noting this is not an “extreme factual situation.” Even though there is a dispute of facts concerning what exactly occurred between Officers Ballard and Horner and Peterson, the majority holds the factual situation is not extreme enough for a theory of ratification to apply. The majority is making a factual determination. It is for the jury to make factual and credibility determinations. See Richardson, 12 F.3d at 1381-82.
Here, Peterson showed: at least two people, he and Officer Horner, believed Officer Ballard performed a knee strike; Officer Ballard did not believe a knee strike was warranted under the circumstances; and neither officer was disciplined for the incident, despite the department’s policy that when an officer uses force or sees another officer use force, a Use of Force report is to be filled out.
City of Forth Worth Police Department General Order 306.09 requires “any use of force incident during which the level of force used was hard open-hand control and restraint or greater shall be reported and identified as ‘Use of Force by an Officer.’ ” The General Order specifically directs an officer to “report the full details of the use of force in related arrests or offense reports. If no arrest or offense report is to be completed, the details shall be reported in an incident report.”
At the time of completing the Use of Force report, “[a] separate inter-office correspondence will be completed by the supervisor and forwarded through the officer’s chain of command to be reviewed and filed by the bureau.” These reports are supposed to be completed at the end of an officer’s watch and are to be entitled “Use of Force” and routed to the captain for management review. The captains are charged with reviewing the Use of Force reports “to determine if there is a need for changes in departmental procedures or additional training for the officer” (emphasis added).
Officer Horner testified she saw Officer Ballard use force — a knee strike — which, according to the City’s evidence, is hard open-hand control. Yet, she never filled out a Use of Force report. When it was discovered she never filled out a Use of Report, she was not disciplined for this failure. Chief Mendoza described Officer Horner’s failure to fill out the Use of Force report as “ancillary” to the investigation of Peterson’s allegations. This is problematic for several reasons.
According to evidence presented by the City, such Use of Force reports eventually are supposed to be forwarded to the Training Division for review. According to General Order 306.10, a Training Division captain is tasked with ensuring appropriate training is developed and offered annually. If the police department is not enforcing the self-reporting of use of force, despite the fact that they have an officer who states she believes she saw force used, it is essentially condoning the failure to report. This, in turn, ensures there will never be an assessment of whether training on excessive force should be conducted with greater regularity or in a different manner. Coupling these circumstances with the Defensive Tactics Manual of the Fort Worth Police Academy’s maxim, “If it *855 makes you look good, but it’s not in your report, it didn’t happen,” there appears to be a tacit understanding that if an officer does not raise the issue, he or she may avoid it all together.
The district court attempted to address the issue of Officer Horner’s failure to report the use of force when it dealt with Peterson’s failure to supervise argument. The district court stated the Internal Affairs investigation dealt with the deficiency and relied on Sergeant Decker’s admonition to Officer Horner to be more diligent in the accurate documentation of her work product. Unfortunately, the district court was mistaken as to why Officer Horner was admonished.
The Internal Affairs investigation dealt with the falsification of Officer Horner’s worksheet, including her notations regarding whether Peterson drove away after the encounter. This additional allegation of falsifying her worksheet, which was added during the course of the Internal Affairs investigation, was actually a recrimination against her mistake regarding whether Peterson stayed at the scene, left the scene, or called a friend. It had nothing to do with Officer Horner’s failure to report Officer Ballard’s use of force. If anything, the admonition looks more like an unscrupulous tactic meant to strong-arm a rookie officer into changing her statement by turning up the heat on her.[1]
Drawing all reasonable inferences in favor of Peterson based upon the evidence presented, Peterson has created a question of fact to be submitted to the jury regarding ratification. The City offers no evidence that renders all material facts indisputable. Defeating a summary judgment motion only requires the non-moving party to present sufficient evidence, which creates a dispute of material fact. Because there is sufficient evidence to create a dispute of material fact, I believe the issue of ratification should be submitted to the jury.
B.
The majority correctly points out municipal liability can be based upon a failure to train if there is deliberate indifference to an obvious need for training, which could impair citizens’ constitutional rights. The majority sets forth that municipal liability on a failure to train theory requires that it be obvious that “the highly predictable consequence of not training” its officers was that they “would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.” Brown v. Bryan Co., Okla., 219 F.3d 450, 461 (5th Cir.2000). The majority asserts that Peterson points to no evidence that the City was aware of any risk of injury to knee strikes, and instead relies on to the City’s contention it conducts extensive training on the use of force. The majority concludes Peterson has failed to present a question of material fact concerning whether it was or “should have been obvious to the policy makers that the risk of injury was a ‘highly predictable consequence’ of the failure to train.”
Again, the majority imposes a burden on Peterson, which exceeds what the law requires of him. Peterson need only present sufficient evidence, which creates a dispute of fact concerning the City’s failure to train. In evidence are:
1) Officer Horner’s deposition testimony in which she stated she could not recall training about the adequate use of force for a given set of circumstances;
*856 2) Officer Ballard’s deposition testimony, in which he could not recall receiving training on differences between passive and active resistance in relation to the amount of force used; in which he stated an officer cannot evaluate risk of injury if there is no training; in which he stated he could not recall being told there was a risk of injury when using a knee strike; in which he stated he was written up previously for tasering an individual, who was handcuffed, but he was not told why the act was dangerous; in which he stated he was never retrained on the use of tasers; and in which he stated if he had knowledge regarding risk of using knee strikes, it would make a difference in his calculation of use of force;
3) Chief Mendoza’s deposition testimony, in which he stated he was the overall authority for training and approving training policies of the department; in which he stated an officer is less likely to hit a person in a place that will cause more damage if they understand the reasons for doing so; and in which he stated continuing education does not include training on knee strikes, to his knowledge;
4) Records reflecting allegations of excessive force;
5) A summary chart, detailing allegations of excessive force;
6) Reports of the chain of command;
7) An affidavit of an instructor at the police academy, which states the City provides training in use of force at the police academy and subsequently every twenty-four months, in the form of continuing education, which exceed the minimum training requirements imposed by the state;
8) Officer Horner’s training record; and
9) Officer Ballard’s training record.
In reviewing this evidence, the court’s task is only to determine whether there is a factual dispute regarding the City’s failure to train. The evidence shows officers undergo preliminary training at the police academy, which includes use of force training, and continuing education training on use of force. Executive Chief Deputy Kneblick’s affidavit states each police officer is trained in the application of the General Orders, which includes a General Order on the use of force, and is required to comply with the General Orders.
The more disconcerting pieces of evidence offered by the City, however, are Officer Horner’s and Officer Ballard’s training records. While Officer Horner’s record shows she received continuing education on the use of force, Officer Ballard’s record reveals he has not. Peterson has shown through Officer Ballard’s testimony that he was disciplined on a prior occasion for using a taser on a handcuffed individual. Officer Ballard’s training record does not reflect any retraining on use of a taser, despite his inappropriate prior use. More critically, since the time Officer Ballard joined the police department, he has never taken a course directed specifically at the use of force, according to his training record.
Peterson contends his showing that neither officer could remember whether they received use of force training demonstrates the training is inadequate. Chief Mendoza testified he did not know how often knee-strike training occurred. While both Officers Ballard and Horner testified they were taught the distractionary technique of the knee strike, neither was taught the possible physical consequences of using such a strike. Chief Mendoza, the overall authority for approving training and the content of the Defensive Tactics Manual, testified that training concentrated on where to strike, rather than the *857 repercussions of striking an individual in a particular place. He stated training probably covered that “a little bit.” He agreed during his deposition testimony that an officer would be less likely to strike in a place that would cause serious damage if the officer knew the consequences, and he conceded the type of injury Peterson received could result from a knee strike.
When this evidence is viewed in light of the previous discussion concerning the Use of Force reports, see supra Part II.A of this dissent,[2] reasonable minds could infer a failure to train and deliberate indifference. The policymaker, Chief Mendoza, is hardly concerned with training officers on the potential for harm. It is axiomatic that if an officer does not know the risk of injury in applying a knee strike, there is no way he can appropriately assess when to use it based upon the totality of the circumstances. This would be true of any of the use of force techniques because officers receive no training on the repercussions of using such techniques, as Chief Mendoza testified. Hence, it is clear Peterson has created a dispute of material fact regarding the City’s failure to adequately train its officers sufficient to submit to a jury.
C.
Finally, the majority addresses Peterson’s argument the City has a custom, as evidenced by a persistent, widespread pattern of excessive force during investigations of “mild crimes,” to which the police department’s chain of command acquiesces by citing officers for lesser offenses, exonerating them for use of force, and only mildly disciplining officers who are found to have used excessive force, which amounts to tacit approval of the use of excessive force.
To demonstrate the existence of a custom or policy, Peterson presents the following evidence:
1) Chief Mendoza’s deposition testimony, in which he states allegations of officers’ use of excessive force in the field should be investigated; in which he states making an allegation of excessive force against other officers is a defensive measure to defend oneself and, ultimately, the officer may not be willing to come forward; in which he states he is the ultimate disciplinarian; in which he states a police officer may use force to effectuate an arrest/detention even if there is no legal basis for the arrest/detention (which the district court said was only an opinion and does not affect official policy); in which he discusses an incident where officers illegally entered an apartment and tasered an individual in the closet covered with a black trash bag three to four times until he was unconscious and concludes it was not excessive force;
2) A summary chart which shows 27 allegations of excessive force over a five-year period, which were actually investigated by Internal Affairs- — -where only four complaints were sustained;
3) An interview of a third-party witness, who saw police chase down a man on a *858 bicycle and beat him until his face bled — where the charge of excessive force was not sustained against one officer and unfounded for others;
4) An interoffice correspondence from Executive Deputy Chief Kneblick, reversing a finding of “not sustained” by the rest of the chain of command, in one incident where an off-duty officer struck two individuals on the backs of their heads with his gun; and
5) A summary statement, where a police officer knee-struck a man who was laying on the ground because he tensed, even though the man was actually the owner of the car wash where the police officer was investigating a burglary, which resulted in the officer breaking the owner’s nose — the allegations of excessive force were deemed unfounded.
Peterson contends these allegations put the City on notice that there is an issue with its officers using excessive force and it is so common and well-settled that it represents a policy, which is tacitly condoned by the chain of command, up through the Chief of Police.
To demonstrate the City has a policy which expressly denounces the use of force, the City offers the following evidence:
1) General Orders regarding the use of excessive force;
2) An affidavit of Executive Deputy Chief Kneblick, who states the General Orders are provided to all police officers of the police department regarding the use of force, and the police department supports this policy through training and discipline;
3) The claim there is no evidence the police department officials acquiesced to excessive force;
4) The City conducted a rigorous investigation of Peterson’s complaint; and
5) Peterson’s summary chart, which showed 4 findings of excessive force, no discipline in 18 investigations, and 1 case, which involved the use of a knee strike.
The majority initially couches the inquiry as “whether Peterson has presented sufficient evidence to establish a fact question for municipal liability on the basis that the City maintained an official policy that was permissive of excessive force.” In the next instance, however, the majority couches the inquiry as a question of law, suggesting “[t]he legal question thus presented is whether the 27 complaints on which Peterson relies are sufficient to establish a pattern of excessive force that can be said to represent official policy.”
It is not our duty to address the latter question. The appropriate question is whether Peterson has presented sufficient evidence to create a dispute of material fact about the existence of a widespread pattern of excessive force condoned by the City. The Supreme Court made clear that “[o]nce those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the ‘standard operating procedure’ of the local governmental entity.” Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989) (citations omitted). It is for the jury now to determine whether 27 instances of excessive force allegations are reflective of a standing operating procedure that may have caused the deprivation of Peterson’s rights.
The majority, like the district court, relies on this court’s decision in Pineda v. City of Houston, 291 F.3d 325 (5th Cir. *859 2002), and concludes 27 complaints of excessive force are insufficient to establish a pattern of use of excessive force. It points out that in Pineda 11 incidents of warrant-less entry did not support a pattern of unconstitutional warrantless entry because the officers in the 11 incidents reported either consent or exigent circumstances, which was equivocal evidence of Fourth Amendment compliance.
The facts and circumstances in Pineda are readily distinguishable. First, in Pineda, 291 F.3d at 328, the plaintiff alleged the City of Houston had a custom of permitting warrantless searches of residences. Peterson’s alleged custom is much narrower: the use of excessive force in violation of the Fourth Amendment during investigations of “mild crimes,” to which the police department’s chain of command acquiesces by citing officers for lesser offenses, exonerating them for use of force, and only mildly disciplining officers who are found to have used excessive force, which amounts to tacit approval of the use of excessive force. Unlike in Pineda, where the alleged municipal custom would apply to all warrantless searches in any instance, Peterson’s alleged custom focuses on minor crimes, where the chain-of-command ultimately exonerates or finds the claim unsustained or issues only mild discipline when the claim is founded.
Second, Peterson’s proffer of evidence concerning the use of excessive force as a City custom consists of more than double the number of quantifiable allegations than were offered in Pineda. In Pineda, the court reviewed the proffer of 11 alleged incidents, which occurred over a period of more than six years “in one of the Nation’s largest cities and police forces.” See id. at 329, 331 n. 24. Here, Peterson relied on hundreds of pages of reports, which he condensed into his Summary Chart, over a period from 2001 to 2005.[3] This court opined in Pineda, however, that relying on previous offense reports could lead to the “practical effect” of “requiring] the City to defend ‘cases within cases.’ ” Id. at 329. While that may be a “practical effect” sometimes, it is not necessarily the case here.
Here, Peterson alleges not simply that these allegations show a custom of permitting the use of excessive force. Rather, Peterson contends these allegations, gleaned from the numerous reports he examined, show the City had notice of such violations, which were reviewed by the chain-of-command, evincing a flawed system by which various police officers at different levels of the chain-of-command could not or did not agree on whether excessive force was used, which has led to the acquiescence or condonation of the use of excessive force. Foreclosing the use of such evidence, which might show to the trier of fact that the City has notice of a problem and chooses to look the other way, essentially forecloses municipal liability on a theory of “custom.” This is certainly not the result portended by Monell v. Dep’t of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
Third, this case is distinguishable from Pineda because in addition to producing a quantifiably greater number of incidents[4] *860 to establish the alleged custom, Peterson offers the police department’s own maxim: “If it makes you look good, but it’s not in your report, it didn’t happen.” The City’s police officers are taught this idea at the police academy. The obvious corollary is “if something is not reported, it will not impact you [the officer].” The circumstances of Pineda do not evidence a similar understanding of withholding information for the purpose of avoiding reprimand or investigation.
Finally, Peterson offers the testimony of Chief Mendoza, who conceded he was the ultimate disciplinarian for police officers in the police department. The district court determined the City did not have a policy permitting the use of excessive force in part based on Chief Mendoza’s testimony, when he stated: “I don’t believe officers can use force against people without ... there being some reasonable suspicion or probable cause that a crime has been committed or is about to be committed.” However, subsequent to stating this opinion, Chief Mendoza readily stated a police officer may legally use force even if a police officer does not have a legal right to enter a private residence and make an arrest.
The Record reflects the following exchange between Peterson’s counsel and Chief Mendoza during deposition:
Q. (By Ms. Hutchinson) If they didn’t have the legal right to be in the apartment and they didn’t have the legal right to make an arrest, then they also didn’t have the legal right to use force, correct?
A. No, ma’am.
Q. That’s not correct?
A. That’s not correct.
The district court dismissed this particular comment as Chief Mendoza’s opinion.
Whether Chief Mendoza actually believes the former or the latter of his statements are factual and credibility determinations for the jury. The latter commentary could be construed as the police department policymaker’s interpretation of the law on the use of reasonable force.
In Pineda there is no indication the chief of police made a statement that resembled the content of Chief Mendoza’s statement. A reasonable jury could return a verdict in favor of Peterson if it were to find, as a matter of fact, Chief Mendoza believes his latter interpretation of the law complies with the strictures of the Fourth Amendment and he acts in his capacity as chief of the police department on that belief when he reviews excessive force claims. See Fraire, 957 F.2d at 1273 (“A dispute about a material fact is genuine ‘if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.’ ”) (footnote omitted).
The majority further relies on dicta from Pineda, in which this court stated the size of a police department may be relevant to determining whether a series of incidents can be called a pattern. While this guidance from Pineda could be helpful in this case, the fact is there is no evidence in the Record concerning the size of the City’s police department. In the City’s brief on appeal, it merely argues there were numerous arrests and detentions made over a five-year period. The closest the City comes to revealing how many *861 officers are in its police department is when it stated in its reply in the district court that there were “hundreds of thousands of arrests and detentions made over a five year period by over one thousand (1000) police officers employed by the City.” However, the City offered nothing for the Record to support this blanket contention. The absence of any statistical evidence in the Record leaves genuine issues for trial. The number of incidents Peterson offers could be the highest or lowest in cities of a comparable size.
The majority nonetheless concludes the City has demonstrated no genuine issues of material fact regarding a custom condoning the use of excessive force because the majority augments the Record by undertaking its own data search on the City’s website.[5] The majority has essentially done what the City should have endeavored to do in moving for summary judgment and did not do. This is not the court’s duty.
The court’s task is to review whether Peterson has presented sufficient evidence, not all possible evidence, to create a dispute of material fact concerning whether the City has a custom of condoning excessive force, despite the City’s written policies denouncing excessive force. The Record shows 27 allegations of the use of excessive force, which largely were unsustained by a policymaker who believes a police officer may use force to effectuate an arrest/detention, even if there is no legal basis for the arrest/detention. Most critically, the City failed to offer any competent evidence to demonstrate what those 27 incidents mean in light of the number of citizen encounters for a city of comparable size. Hence, there remains a dispute of fact regarding whether the City has a custom of condoning excessive force.
III.
Peterson has presented sufficient evidence to create a dispute of fact regarding whether the City can be held hable on theories of ratification, a failure to train, and a custom of condoning excessive force. Because it is the court’s duty to review whether, in resolving all doubts and inferences in a light most favorable to the nonmoving party, Peterson has presented sufficient evidence to create a dispute of material fact regarding the existence of a policy, the district court’s decision should be REVERSED, and this case should be REMANDED for trial.

. Officer Horner received her commission as a Fort Worth Police Officer in December 2004, approximately nine months prior to the alleged incident.

. The majority's assertion, that the department’s failure to reprimand Officer Horner for "an instance of faulty recordkeeping” does not raise a genuine issue of material fact on whether the obvious and "highly predictable consequences” of this failure would lead to the violation of citizens’ Fourth Amendment rights ignores the purpose of the process of reporting the use of force. The express purpose of the Use of Force reports is "to determine if there is a need for changes in departmental procedures or additional training for the officer.” If the department does not enforce the reporting requirement, it essentially bypasses the procedure meant to inform it of what, if any, use of force training is necessary to ensure citizens’ constitutional rights are not violated.

. Two incidents described in the summary chart occurred in 2007.

. Such a distinction is made without considering the relative size of the respective cities and police forces. Obviously, the fact that 27 incidents occurred in a smaller city with a smaller police department undermines the efficacy of relying on Pineda.
The majority's suggestion "[n]o reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force” is undercut by the very fact that this *860 panel has split on the issue of whether Peterson established a question of fact concerning municipal liability for purposes of withstanding summary judgment. “Indeed, the fact that reasonable judges on this court view the evidence differently suggests that these factual disputes [a]re for the jury to resolve.” Thompson v. Connick, 578 F.3d 293, 314 (5th Cir.2009) (en banc) (Prado, J., joining).

. The majority’s review of the City's website presented the following evidence: "[The City] presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone.” This led the majority to conclude: "[g]iven the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct.” A conclusion based upon evidence not in the Record is simply insufficient to affirm the district court's grant of summary judgment.