IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 01-20189

CLAUDIA NAVARRO PINEDA, Etc; ET AL,

Plaintiffs

CLAUDIA NAVARRO PINEDA, Individually, Representative of the Estate of Pedro Oregon Navarro; ANA ISABEL LORES as next friend of Ashley, minor daughter of Pedro Oregon Navarro; BLANCA LIDIA VIERA, as Next friend of Belinda, minor Daughter of Pedro Oregon Navarro; SUSANA OREGON NAVARRO,

Plaintiffs-Appellants,

versus

CITY OF HOUSTON; ET AL,

Defendants,

CITY OF HOUSTON

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

May 9, 2002

Before KING, Chief Judge, and GARWOOD and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Houston police officers shot and killed Pedro Oregon Navarro following an unconstitutional warrantless entry into his residence. Members of his family filed this suit asserting a § 1983 claim against the City of Houston, as well as supplemental state claims. The district court granted summary judgment to the City on the §

1983 claim and dismissed the supplemental claims with prejudice. This appeal followed. We affirm the grant of summary judgment as to the § 1983 claim and modify the order dismissing the state claims to provide that those claims are dismissed without prejudice.

I

On July 11, 1998, Houston police officers and members of the Southwest Gang Task Force Pete Herrada and J.R. Willis were patrolling in southwest Houston when they stopped a car for a traffic violation.[1] This stop led to the arrest of the driver, Ryan Baxter, who volunteered to give information about his drug supplier, a person called Rogelio, in exchange for lenient treatment. The two officers contacted the other members of the SWGTF. Sergeant Darrell Strouse and officers David Perkins, Lamont Tillery, and David Barrera, also members of the task force, joined Herrada and Willis. Together they devised a plan for expanding the catch.

By the initial plan Baxter was to meet Rogelio at a local fast-food establishment, setting up a search of his car. It didn't work—Rogelio did not appear. Baxter paged Rogelio again, this time confirming that Rogelio would be at his apartment and would make the sale there. The officers went to the apartment, but no one was

---

[1] The facts of this case are set out in more detail in our recent decision in *United States v. Strouse*, No. 00-20558, 2002 WL 433160 (5th Cir. Mar. 20, 2002).

home. After waiting until 1:30 a.m. on July 12, the officers returned to the apartment and, without obtaining a search warrant, had Baxter knock on the door. When the door opened, Baxter dropped to the ground and the GTF officers, waiting at the foot of the stairs, rushed into the apartment. There were several people in the apartment, and in the commotion one of the officers apparently shot another in the back, followed by a fusillade from the officers killing Pedro Oregon Navarro. A pistol found near Oregon's body was identified as belonging to Oregon.[2]

## II

We review the district court's grant of summary judgement *de novo*.[3]

### A

First, the rote. Section 1983 offers no *respondeat superior* liability. Municipalities face § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...."[4] Proof of municipal

---

[2] The plaintiffs' opening brief states that "[a] pistol was found near Mr. Oregon's body, identical to one Officer Tillery carried as his second, personal gun." Appellants' Brief at 9. The City, however, notes that Rogelio Oregon Navarro testified that the pistol belonged to his brother Pedro. R. at 2226. *See also Strouse*, 2002 WL 433160 at *2 (noting that Oregon possessed a gun).

[3] *Starkman v. Evans*, 198 F.3d 173, 174 (5th Cir. 1999).

[4] *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978).

liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy (or custom).[5]

Early cases following *Monell* dealt with official policies or acts by a governing body fairly attributable as the acts of the local government itself.[6] In those cases, "there was no question but that the objectionable conduct was city policy."[7] Treating claimed municipal liability in the absence of a "smoking gun" we marked two paths of proof:

> 1. A policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
> 2. A persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the

---

[5] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

[6] *See Monell*, 436 U.S. at 658 (discussing policy of New York City that essentially forced pregnant employees to take leaves of absence without pay); *Owen v. City of Independence*, 445 U.S. 622, 633 (1980) (finding no immunity for city where city council released to public allegedly false statement impugning police chief's honesty).

[7] *Bennett v. City of Slidell*, 728 F.2d 762, 766 (5th Cir. 1984) (en banc).

municipality liable under § 1983 unless they execute official policy as above defined.[8]

The plaintiffs here claim two theories of liability: (1) an unwritten municipal custom of warrantless searches of residences in violation of the Fourth Amendment; and (2) inadequate training.

### B

### 1

Turning to the claim that the SWGTF engaged in a pattern of unconstitutional searches pursuant to a custom of the City, we note first that one act is not itself a custom.[9] There must be a "persistent and widespread practice."[10]

The effort to create a triable fact issue regarding custom was creative and took the following form. From 5,000 offense reports produced by the City in discovery, counsel selected approximately 500 involving narcotics. These were the predicate for opinion evidence on custom by their expert witnesses. While the opinions offered referred to a greater number of incidents, the district court considered only those accompanied by offense reports in the summary judgment record. The district court relied upon 11 of the

---

[8] *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc); *see also Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405-07 (1997).

[9] *Piotrowski*, 237 F.3d at 581.

[10] *Id.*

5

reports of a warrantless entry into residences by the SWGTF.[11]  The plaintiffs urged that this evidence met their summary judgment burden.

The district court was persuaded that these 11 (of 13) incidents for which there were offense reports in the summary judgment record were competent summary judgment evidence of a pattern of unconstitutional searches—enough to defeat summary judgment for want of proof of custom.[12]  We are not persuaded that this proof creates a fact issue on the issue of a pattern of conduct.

Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces. The extrapolation fails both because the inference of illegality is truly uncompelling—giving presumptive weight as it does to the absence of a warrant—and because the sample of alleged

---

[11] The experts cited to more than the 13 incidents reported by the district court in its table.  The offense reports did not accompany the experts' citation to those incidents and the district court therefore did not consider incidents beyond those 13.  One expert cited 33 warrantless entries into residences and the other cited 17 in their affidavits.

[12] The 13 incidents were broken down as follows.  In 5 incidents the officers reported consent as the applicable exception to the warrant requirement. The district court accepted these incidents as competent summary judgment evidence of unconstitutional searches.  In 7 incidents "exigent circumstances" were cited.  Three of these involved pursuit, three involved the smell of burning drugs, and one the spotting of contraband in plain view by officers.  The district court accepted these incidents as well.  In the last report, there was no Fourth Amendment interest, as the arrestee was a trespasser. *See Pineda v. City of Houston,* 124 F. Supp.2d 1057, 1070-77 (S.D. Tex. 2000).  The district court did not consider one of the "exigent circumstances" incidents, because it occurred in March 1999, *after* the shooting at issue in this case.

unconstitutional events is just too small.  Opinion evidence resting heavily on this data added little if anything.  Left without legs, the opinions were little more than suspicion, albeit by informed persons.  The weakness in the approach is apparent in its practical effects.  It requires the City to defend "cases within cases" from historical records to justify searches conduced without a warrant.  The burdens of proof on a contested warrantless entry of a home have little to do with the use here of the City's records.  The district court was wisely wary.  Although the district court went further than we think the record warrants its decision on this point was a nigh arguendo ruling; allowing it to move to an even weaker link in the proof.

2

Even if this proof was, contrary to our view, sufficient to create a disputed issue of fact on custom, there remains the burden of demonstrating actual or constructive knowledge of the policy-making official for the municipality:[13]

---

[13] The plaintiffs argue that there is no distinction between proof of a pattern of unconstitutional conduct sufficient to constitute a customary policy and proof of constructive knowledge of such a policy.  The cases do not support this argument.  *See, e.g., Bennett*, 728 F.2d at 768; *see also Piotrowski*, 237 F.3d at 578-79 (noting that liability requires actual or constructive knowledge on the part of municipal policymaker); *Webster*, 735 F.2d at 842 ("Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority.").  A pattern may exist without actual or constructive knowledge because the facts of the events are concealed from policymakers.  However, the sheer numerosity of incidents *can* provide evidence of constructive knowledge.  *See* note 15.

> Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.[14]

The plaintiffs do not allege that the policymakers for the City, the Police Chief and his Assistant Chiefs, had actual knowledge of the pattern of unconstitutional searches relied upon by the district court. Instead they argue that the pattern of unconstitutional searches by the SWGTF is sufficient to survive summary judgment because it was widespread enough to impute constructive knowledge to the policymakers.

We are not persuaded. First, the weakness in proof of any pattern of illegalities aside, the plaintiffs provided no evidence that the incidents were the "subject of prolonged public discussion or of a high degree of publicity."[15] Rather they urge that any municipality that collects numerous offense reports, a small proportion of which include warrantless searches ostensibly, from the investigating officer's perspective, within an exception to the

---

[14] *Bennett*, 728 F.2d at 768.

[15] *Id.*; *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) ("Sufficiently numerous prior incidents of police misconduct, for example, may tend to prove a custom *and* accession to that custom by the municipality's policymakers. Isolated instances, on the other hand, are inadequate to prove knowledge and acquiescence by policymakers.") (emphasis added); *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987) ("Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these.")

Fourth Amendment's warrant requirement, maintains not only a custom of unconstitutional searches, but that knowledge of this should be imputed to the municipal policymakers. This is functionally the *respondeat superior* regime the Supreme Court has repeatedly rejected.[16]

Second, the plaintiffs provide opinion evidence that the offense reports and number of warrantless searches performed by the SWGTF sent a clear signal to supervisors and policymakers that a pattern of unconstitutional behavior existed within the SWGTF.[17] Such opinions as to whether or not policymakers had constructive knowledge do not create a fact issue, as the "experts" were unable to muster more than vague attributions of knowledge to unidentified individuals in "management" or the "chain of command."[18] In fact, the offense reports were summarized and presented in digest form and the plaintiffs' experts failed to demonstrate how the unconstitutionality of the reported searches could be gleaned from these summary reports. All of this assumes that policymakers may

---

[16] *See, e.g., Bryan County*, 520 U.S. at 410 ("To prevent municipal liability ... from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.").

[17] *See, e.g,* Affidavit of Thomas Parker, R. at 4172 ("The command staff and operational managers and supervisors of the Houston Police Department essentially ignored the abundant and significant warning signs of such unauthorized and illegal enforcement tactics by members of the GTF, allowing such tactics to become tacitly approved—though illegal and unwritten—standard operating procedures."); Affidavit of James Fyfe, R. at 4409 ("By my assessment ... these involvements included apparent improper police behavior that should have been apparent to reviewing supervisors and HPD administrators.").

[18] Fyfe Affidavit, R. at 4408; Parker Affidavit, R. at 4187.

9

not rely on the representations of police officers as to the existence of an exception to the warrant requirement.[19] These offense reports are insufficient to establish *actual* knowledge of a pattern even in the hypothetical case that the plaintiffs provided proof that the policymakers had read the *individual* reports. It follows, then, that there can be no constructive knowledge of an unconstitutional custom from the reports passing through the "chain of command" in summary form.[20]

Finally, the plaintiffs cite the First Circuit's decision in *Bordanaro v. McLeod*,[21] finding knowledge where the policymaker "utilized an extensive report review process to monitor the conduct of his officers and to ensure their compliance with the rules of the department."[22] That police department was vanishingly small in comparison to the HPD, considering that the entire night watch consisted of just *five* police officers.[23] The case is not comparable to the 7, or fewer, instances of unconstitutional

---

[19] For example, the policymakers would plainly have been entitled to rely on "consent" as an exception to the warrant requirement. This would leave only 7 incidents for which district court found the plaintiffs had presented competent summary judgment evidence of unconstitutional searches.

[20] The City notes that large police departments use other methods to monitor police misconduct such as investigating community complaints, monitoring changes in the number of dismissals of cases by the District Attorney, and communication with the District Attorney. *See* Appellee's Brief at 18-19.

[21] 871 F.2d 1151 (1st. Cir. 1989).

[22] *Id.* at 1157.

[23] *Id.*

10

searches out of the 500 narcotics and search-related instances in 5000 offense reports from the SWGTF.[24]

We conclude that the plaintiffs have failed to present a genuine issue of material fact on their "custom of unconstitutional residence searches" theory. We now turn to the claim of inadequate training.

C

"It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability."[25] In order to establish the City's liability, the plaintiffs must show (1) inadequate training procedures; (2) that inadequate training caused the task force officers to shoot Oregon; and (3) the deliberate indifference of municipal policymakers.[26] As we will explain, the plaintiffs have failed to raise a genuine issue of material fact as to inadequate training and causation, and do not reach the question of sufficiency of evidence of deliberate indifference.

1

The plaintiffs must raise a genuine issue of material fact with respect to whether the training procedures for GTF officers, which were identical to those employed for other uniformed patrol

---

[24] These offense reports were from the period of approximately November, 1993 to December 1999.

[25] *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

[26] *Id.*; *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000).

11

officers, were inadequate. "In resolving the issue of a city's liability, the focus must be on [the] adequacy of the training program in relation to the tasks *the particular officers must perform*."[27] The inadequacy of training must be closely related to the injury.[28]

The plaintiffs argue that the GTF officers were consistently engaged in narcotics investigations that require specialized training and that the lack of a mission statement and standard operating procedures for the GTFs created confusion as to their function.

According to the summary judgment record, former Police Chief Nuchia stated publicly that "undercover narcotics work and dealing with informants and search warrants are complex tasks, requiring special knowledge and skills." The plaintiffs also presented the testimony of Chief Bradford that specialized narcotics investigations involve confidential informants, case-related informants, and covert and plainclothes operations. To support their view that GTF officers were confused about their role, the plaintiffs also provide the testimony of Kimbra Ogg, the then-director of the Mayor's Anti-Gang Office that (a) GTF members were confused about their role in narcotics investigations; (b) her belief that GTF officers were not adequately trained; (c) her fear

---

[27] *City of Canton*, 489 U.S. at 390 (emphasis added).

[28] *Burge v. Parish of St. Tammany*, 187 F.3d 452, 472 (5th Cir. 1999).

12

that zero tolerance policing put the GTF officers in confrontational situations with citizens; and (d) that she, at least twice, voiced her concern to HPD command staff members.

The plaintiffs have not raised a fact issue on the inadequacy of training with this evidence. First, except as it relates to Fourth Amendment violations and training, none of this is relevant to the plaintiffs' inadequate training theory. For instance Kimbra Ogg's testimony is devoid of references to officer misconduct and merely repeats her vague feeling that there was a "confrontation" for which the officers required more training. It is apparent from her deposition that the training she is referring to relates to sensitivity to community concerns. Additionally, Ogg admitted she had no notion that GTF officers were conducting warrantless searches, and thus her conclusions about training are inapposite.[29]

Second, even when viewed in a light most favorable to the plaintiffs, the evidence cannot establish that the officers were untrained in the Fourth Amendment's warrant requirement and the necessity of an exception to a warrantless search. In fact, the manner in which the officers filled out the offense reports that the

---

[29] *See* Ogg Deposition at 40 ("Generally, what would happen is: Police officers would call, they would desire to attend some kind of gang training, usually held by somebody outside the Houston Police Department. They would call us, to try and help them get funding to attend these trainings. Sometimes we were able to; sometimes we weren't."). Additionally, on cross-examination Ogg admitted to having no knowledge of any pattern of Fourth Amendment violations by GTF officers or their participation in "buy-busts." *Id.* at 77-80. Finally, with reference to the "confusion" about the role of the GTF, Ogg admitted that no GTF officer ever told her that he was confused about whether or not he was allowed to enter a residence without a warrant to conduct a search for narcotics. *Id.* at 83-84.

plaintiffs rely upon for their "pattern" theory belies the notion that the officers were untrained in basic Fourth Amendment law.

The summary judgment record cannot support the plaintiffs' assertion that the training the SWGTF officers received was inadequate. The plaintiffs presented no evidence regarding additional training the SWGTF officers should have received that would have prevented the incident here—they only repeat that "specialized narcotics training" was required, without ever defining the content of that statement. This conflates the issue of whether GTF officers were performing certain types of unauthorized investigations with whether they were properly trained in Fourth Amendment law. The plaintiffs must create a fact issue as to the inadequacy of the Fourth Amendment training received by GTF officers. The plaintiffs do not allege, and do not provide evidence, that the officers were so untrained as to be unaware that warrantless searches of residences absent an applicable Fourth Amendment exception, such as consent, were unconstitutional.[30] And we think that ignorance of such basic rules is most unlikely.

---

[30] The plaintiffs cite to the HPD evaluation of the officers, which found that their conduct "exhibited" a lack of knowledge of Fourth Amendment procedures. *See* Appellants' Brief at 41-42. The City, however, correctly notes that this evaluation says nothing about the *training* that the officers received. *See* Appellee's Brief at 40 n.8.

14

This stands in marked contrast to *Brown v. Bryan County*[31] and *City of Canton v. Harris*.[32] In *Bryan County* the deputy who caused the plaintiff's injury had received *no* training in proper pursuit and arrest techniques. In *City of Canton* the officer had received rudimentary first-aid training, but allegedly not enough to recognize a detainee's serious illness. There is no evidence in the summary judgment record to indicate that the SWGTF officers' Fourth Amendment instruction was deficient as to when warrantless searches could be performed. Without this evidence plaintiffs cannot survive summary judgment. This is nothing new:

> Neither will it suffice to prove than an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. *And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.*
>
> Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.[33]

---

[31] 219 F.3d 450, 457 (5th Cir. 2000).

[32] 489 U.S. 378, 390 (1989).

[33] *City of Canton*, 489 U.S. at 391 (emphasis added).

15

The Seventh Circuit's decision in *Palmquist v. Selvik*[34] is instructive.  In *Palmquist*, police officers were allegedly not trained to deal with "abnormally behaving" individuals.  The Seventh Circuit found that the plaintiff failed to establish inadequate training because, while there was no special training in how to deal with such individuals, a rule of "no special training = deficient training" must be rejected because it "would ignore the training the officers did receive ... [in] basic recruit training ...."[35]  The plaintiffs here also have ignored the basic training the GTF officers received.

2

This flaw in the plaintiffs' case can also be viewed as a failure to provide evidence of causation.  The requirements of proof of inadequacy of training and causation are, in many respects, intertwined.[36]  In *Palmquist*, as here, the plaintiff relied upon expert testimony that did not include any reference to the relevant

---

[34] 111 F.3d 1332 (7th Cir. 1997).

[35] *Id.* at 1345.  *Cf. Brown v. Gray*, 227 F.3d 1278, 1286-87 (10th Cir. 2000) (disposing, in § 1983 case arising out of actions of off-duty police officer in city with always-on-duty policy, of city's argument that plaintiff had presented no evidence that training was inadequate other than the incident (a shooting) itself, by noting evidence of: (1) lack of distinction in officer training between on-duty and off-duty situations; and (2) expert testimony that risks and circumstances were different and required different training for off-duty police.).  In this case, by contrast, the plaintiffs' merely state and re-state that "because the City has admitted that specialized training is required for officers in such situations [specialized narcotics investigations], there is sufficient evidence that the training was inadequate." Reply Brief at 21. No butterfly will emerge from this hollow chrysalis of an argument.

[36] *See, e.g., Palmquist*, 111 F.3d at 1345-46 (employing similar arguments and evidence to find plaintiff's case on inadequate training lacking with respect to both inadequacy of training and causation).

16

training that the offending officers had actually received, a flaw the Seventh Circuit found fatal.[37]  In this case, the plaintiffs' experts do not reference the Fourth Amendment training the officers had received prior to the shooting.  Even assuming the plaintiffs have created a genuine issue of material fact as to whether or not GTF officers were performing narcotics investigations in violation of HPD policy, and that GTF officers were not adequately trained to perform such investigations,[38] that does not mean that their lack of training *caused* the injury to Oregon, which  for these purposes we assume was the result of a warrantless search of a residence in violation of the Fourth Amendment.  There is no competent summary judgment evidence of any causal relationship between any shortcoming of the officers' training regarding warrantless searches of residences and the injury complained of.  Viewing the evidence in the light most favorable to the plaintiffs, the record fails to put at issue whether additional training would have avoided the accident.

3

For the same reasons, the plaintiffs' theory that this case falls within the "single incident exception" fails.  Charged to

---

[37] *Id.* ("In fact, plaintiff's counsel repeatedly advised the court that its experts did not offer testimony about the training which had been received by Sergeant Selvik and the other Bensenville officers.").

[38] This training might include that necessary for undercover work, buy-busts, etc.

administer a regime without *respondeat superior*, we necessarily have been wary of finding municipal liability on the basis of this exception for a failure to train claim.[39] The evidence must establish culpability and causation within the exacting requirements of the Supreme Court's decisions.[40] In the only case in this circuit to apply the single incident exception to a failure to train claim, *Bryan County*, we stressed the requirements of notice and causation.[41] Assuming arguendo that the plaintiffs have raised a fact issue with respect to whether or not GTF officers were performing specialized narcotics operations, the void in the record remains: the summary judgment record sheds no light on any lack of training in the application of the rules of search and seizure or any evidence of a causal relationship between a lack of training and the death of Oregon.

The plaintiffs' single incident argument proves too much, as it essentially requires, again, that any Fourth Amendment violation be sufficient to satisfy the exception.

III

---

[39] *Cozzo v. Tangipahoa Parish Council—President Gov't*, 279 F.3d 273, 288 (5th Cir. 2002) (noting that this court has frequently rejected application of the single incident exception). *Cf. Bryan County*, 219 F.3d at 460 (finding single incident exception applicable where county had failed to provide any training to a deputy).

[40] *Id.* at 461.

[41] *Id.* at 461 n.11 (distinguishing *Snyder* on the grounds that the holding of that case rested on policymakers lacking notice and the absence of a causal link).

Finally, the plaintiffs appeal the dismissal of supplemental state law claims for wrongful death under the Texas Wrongful Death Act[42] and the Texas Tort Claims Act.[43] They argue that these state law claims were considered *sua sponte* by the district court and that summary judgment was improper because they were not given the opportunity to present their case. A district court is "empowered to enter summary judgment *sua sponte*"[44] provided that "the losing party has ten days notice to come forward with all of its evidence in opposition to summary judgment."[45] The record did not disclose the requisite notice to the plaintiffs that the district court was considering granting summary judgment on these state claims. Relatedly, with the focus of the parties elsewhere, the state law claims go untreated in its thoughtful opinion.

The City advances two arguments in support of the district court's grant of summary judgment on the plaintiffs' "state claims." First, it claims that the TWDA does not create a separate cause of action and is merely a mechanism for granting a remedy for a violation of § 1983 where there would otherwise be no such violation. Second, it argues that the plaintiffs have not pled the

---

[42] Tex. Civ. Prac. & Rem. Code § 71.001.

[43] Tex. Civ. Prac. & Rem. Code § 101.021.

[44] *Geraghty and Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 923 (5th Cir. 2001).

[45] *Love v. National Medical Enterprises*, 230 F.3d 765, 770-71 (5th Cir. 2000).

19

requisite waiver of sovereign immunity under the TTCA.[46] The plaintiffs claim that their alternative theory of negligence on the part of the officers, while not pled with great detail, should have been the subject of a motion to for a more particular pleading, and at the very least not subject to a grant of summary judgment *sua sponte*. The City's first argument fails to accommodate *Rhyne v. Henderson County*,[47] where we affirmed a district court's dismissal without prejudice of a plaintiff's supplemental state claims in analogous circumstances.[48] We leave to the Texas courts the question of the sufficiency of the plaintiffs' pleading.

IV

Plaintiffs were unable to create a genuine issue of material fact with respect to their § 1983 claims, and therefore we AFFIRM the district court's grant of summary judgment. Given the present posture of the case the best course is to dismiss the supplemental state claims. We therefore VACATE the grant of summary judgment to the City on all state claims and MODIFY the district court's order by dismissing those claims without prejudice.[49]

---

[46] *See* Red Brief at 55-57.

[47] 973 F.2d 386 (5th Cir. 1992).

[48] *Id.* at 395.

[49] The City notes that the plaintiffs have not briefed this issue with respect to the survival claim brought by Susan Oregon Pineda as representative of the Estate of Pedro Oregon. The district court noted that it was unclear whether or not the Estate had asserted a wrongful death claim against the City. *Pineda*, 124 F. Supp.2d at 1090 n.125. The plaintiffs' briefs refer only to wrongful death claims, and not to survival claims.

20

AFFIRMED in part, MODIFIED in part.