# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 30, 2022

Lyle W. Cayce
Clerk

No. 20-40050

DIANA BOND, *as Representative/Heir of the Estate of Tami Bond and as next friend for A.R.B., a minor child*,

*Plaintiff—Appellant*,

*versus*

NUECES COUNTY, TEXAS; JOHN DOE #1, *Individually*; JOHN DOE #2, *Individually*; JANE DOE #1, *Individually*; JANE DOE #2, *Individually*; ELIZABETH ALVARDO; JASMINE DRAKE; MICHAEL ALVAREZ; ANTHONY MUNOZ; JOSE RODRIGUEZ; LUIS RIVERA; JOSE AGUAYO; CHRIS GOMEZ; WELLPATH L.L.C.; JACKIE BLEVINS,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:19-CV-43

Before HIGGINBOTHAM, SMITH, and DENNIS, *Circuit Judges*.

JAMES L. DENNIS, *Circuit Judge*:*

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-40050

Plaintiff Diana Bond, as representative of the estate of her deceased daughter, Tami Bond, sued Nueces County under 42 U.S.C. § 1983. Bond claimed that employees of the Nueces County Jail had violated Tami's constitutional rights by failing to provide her with necessary emergency medical treatment following her ingestion of two bags containing a substance believed to be amphetamine or methamphetamine. After the district court granted Bond leave to file two amended complaints, it dismissed her claim against Nueces County and rejected her third amended complaint for futility, concluding that she had failed to allege facts sufficient to establish municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Bond appeals these rulings, challenging both the dismissal and the district court's denial of leave to amend.

## I.

### A. Background

The following allegations are taken from Bond's second amended complaint.[1] Although a wholly different version of events may ultimately be proven as the case progresses, we must accept them as true at this stage of the litigation. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Thus, for purposes of this appeal, we assume as follows:

On or about February 6, 2017, police officers arrested Tami Bond, charged her with possession of a controlled substance and tampering with evidence, and took her to the Nueces County Jail. At an unspecified time prior to or during her arrest, Tami swallowed two baggies containing amphetamine or methamphetamine. It is unclear from the face of the complaint whether jail officials knew that Tami had ingested the baggies.

---

[1] For the sake of clarity, we refer in this opinion to Diana Bond, Tami's mother, as "Bond," and to Tami Bond as "Tami."

2

However, the complaint alleges that the "[d]efendants are aware that during each and every shift of every single day, that the possibility that someone (especially someone that is accused of tampering with evidence by ingestion) could very well have complications associated with the use/ingestion of same." Intake officials were aware of the ingestion, and other jail officials responding to her sickness searched her cell for drugs. We therefore can infer that both the intake officials and other jail officials had knowledge that she had consumed drugs, and that her erratic behavior and sickness resulted from that consumption.

During her initial booking, Tami was calm, coherent, and not exhibiting any cause for medical concern. She answered "no" when the nurse responsible for inmate care asked whether she had any medical issues. Soon after, however, Tami's condition began to rapidly deteriorate, and she became uncooperative. Because she was unwilling or unable to follow verbal commands, jail authorities halted the booking process and placed Tami in a holding cell to "cool down." In the cell, Tami lay down on the floor in apparent distress, and over the next few hours, she required assistance from other inmates to stand, use the toilet, and wipe sweat from her face. Throughout this time and during the events that followed, Tami and the inmates assisting her repeatedly requested medical attention for her worsening condition, but the jail employees did not provide it.

Tami's actions became increasingly erratic, and when she began grabbing at unseen objects in the air, guards entered the holding cell and searched it for narcotics. During the search, Tami displayed clear indications that she was no longer lucid, sweating profusely and talking incoherently. The signs of discomfort persisted following the search, with Tami's continuing to lie on the floor clutching her stomach and head in pain and requiring assistance from other inmates to use the toilet. Officers eventually removed Tami from the cell in order to complete her booking. They observed

No. 20-40050

that Tami had seemingly become extremely intoxicated, stumbling and slurring her speech, but the officers did not have Tami medically reassessed or otherwise address the signs of a possible narcotics overdose.

After the officers returned Tami to the holding cell, she continued to hold her stomach and behave strangely, including by pacing, searching the cell for an unknown object, tearing up toilet paper, "smoking" an unseen object, and attempting to sit on a pregnant inmate's stomach and to kiss other inmates. This eventually led the officers to move Tami to a second holding cell and then, when the problems persisted, to an isolation cell. Although the jail's policy required that inmates in isolation cells be placed on a "15-minute watch" to monitor their condition, no watch was conducted. The officers knew that Tami was hallucinating and incoherent, but they did not provide her with medical treatment. While in the isolation cell and in full view of jail officials, Tami slid off the bench where she sat, fell to the ground, and lay twitching and mumbling while covered in sweat and urine. She died of an overdose early the following morning.

## B. Procedural History

On February 5, 2019, Diana Bond, Tami's mother, filed her original complaint in the United States District Court for the Southern District of Texas, asserting, *inter alia*, a § 1983 claim against Nueces County, Texas, based on her daughter's alleged wrongful death.[2] Following a series of

---

[2] Bond also initially asserted a claim under the Americans with Disabilities Act, which she voluntarily dismissed in her second amended complaint, and § 1983 claims against various individual jail officials. Bond identified the jail officials as John and Jane Does in her initial complaint and did not amend the complaint to allege their actual identities until the two-year Texas statute of limitations applicable to § 1983 claims had run. Because an amended complaint to substitute an individual for a John Doe defendant does not relate back to the date of the original complaint under this court's decision in *Jacobsen v. Osborne*, 133 F.3d 315, 320–21 (5th Cir. 1998), and because the district court found that Bond had not diligently pursued her rights as required for equitable tolling of

amendments, Bond's complaint alleged that Nueces County had caused Tami's death by maintaining a series of customs, practices, policies, or procedures related to not providing timely medical care to in-custody individuals.

Nueces County moved to dismiss Bond's second amended complaint, arguing that she failed to allege facts sufficient to establish that a municipal policy or custom had caused Tami's death, as is required for municipal liability under *Monell*. 436 U.S. at 690. On September 5, 2019, the district court entered an order granting the motion. The district court concluded that Bond had failed to allege enough specific facts about prior incidents to demonstrate that Nueces County maintained the no-medical-care customs and policies she had alleged or that those practices were the moving force behind the purported constitutional violations that led to Tami's death.

In its order dismissing the claims, the court granted Bond permission to file a renewed motion for leave to amend her complaint with a proposed third amendment included as an attached exhibit. Accordingly, on September 5, 2019, Bond moved for leave to file a third amended complaint. In the attached proposed complaint, Bond repeated the factual allegations regarding Tami's death detailed above. Bond then added to her allegations regarding the policies maintained by Nueces County that caused Tami's death. She emphasized that the policies she alleged did not concern a complete denial of medical care, but rather "failures to provide *timely and/or immediate* medical treatment" when needed and a practice of instead waiting until "death is near . . . . *well-after* medical treatment should have been

---

the limitations period, the court dismissed Bond's claims against the individual defendants as time barred. Bond does not appeal this ruling, and no claims against the individual defendants are at issue in this appeal.

provided" (Emphases in original). Specifically, she alleged that Nueces County maintained the following policies or customs:

> 1) ignoring the serious medical needs of those entrusted to its care based either on expedience or ignorance to the consequences,

> 2) maintaining and encouraging a custom and practice of denying and/or paying little regard for inmates'/detainees'/arrestees' necessary adequate and immediate (instead of consistently slow and inefficient) medical care and treatment for serious medical conditions by failing to properly and adequately enforce policies and procedures mandated by the Texas Commission on Jail Standards concerning same and/or in completely failing to have policies concerning same,

> 3) failing to have, enforce and/or train concerning medical reassessments for inmates/detainees/arrestees when serious medical conditions arise,

> 4) maintaining and encouraging a custom or practice of delaying medical necessary treatment/care for a serious medical condition exhibited by inmates/detainees/arrestees until such time as it is too late for treatment at all,

> 5) maintaining and encouraging a custom or practice of processing and accepting inmates/detainees/arrestees for incarceration at the booking stage when such person(s) should have been immediately transferred for medical treatment to a health care facility,

> 6) failing to adopt or enforce policies and procedures and maintaining and encouraging a custom and practice that Nueces County knows or should know because of the numerous complaints and incidents reported to Defendant Nueces County from victims of being denied adequate medical treatment for serious medical needs or having their serious

No. 20-40050

medical needs unreasonably delayed while under the custody and control of Defendant Nueces County,

7) failing to investigate and/or discipline those persons whom are found to have ignored the medical needs of such individuals,

8) failing to adequately supervise and/or observe its inmates/detainees/arrestees,

9) failing to provide adequate man power to supervise and/or observe inmates/detainees/arrestees (an "overcrowding" problem that has persisted for years and has resulted in guard/inmate ratios in violation of Texas Jail Standards and the cause of several medical concerns, including many suicides),

10) failing to provide adequate staff to handle situations stemming from the medical needs of inmates/detainees/arrestees,

11) failing to impose proper and sufficient policies and/or procedures as to the screening and/or reassessment of inmates/detainees/arrestees in regard to their medical needs that arise,

12) failing to act in compliance with and failing to enforce the policy (of Texas Jail Standards) concerning proper and timely cell checks of inmates/detainees/arrestees exhibiting symptoms such as Tami did and/or in failing to enforce, train or even have policies that provide for what medical attention to provide in such circumstances when such becomes more life-threatening,

13) failing to train and/or discipline those employees whom are found to have violated any of the above-noted policies,

14) failing to train concerning medical reassessments for inmates/detainees/arrestees who – even while initially may not have signs of obvious medical problems – begin to exhibit

No. 20-40050

> obvious signs of medical problems, including but not limited to, those stemming from the use of illicit drugs, and

> 15) failing to train and/or implement any policies concerning what signs are indicative of extreme drug use and/or to be aware of and what actions to take when someone is exhibiting such obvious signs of medical problems stemming from the use of illicit drugs.

(Cleaned up and line breaks added.) Bond further alleged, regarding the second policy or custom, that the Nueces County Jail failed to properly and adequately enforce policies and procedures mandated by the Texas Commission on Jail Standards. Specifically, they failed to implement and adequately enforce "37 Tex. Admin. Code § 273.2 (requiring any facility—including the Nueces County Jail—to provide, *inter alia*, procedures for "efficient and prompt care for acute and emergency situations" that arise)." Though Bond argued that providing examples of previous injuries caused by the policies was "unnecessary for purposes of pleading," her proposed complaint nonetheless detailed, in a series of footnotes, seventeen specific incidents in the preceding five years in which officials at the Nueces County Jail allegedly failed to provide adequate medical care to inmates, five suicides that had occurred in the jail due to a purported lack of medical care, and one previous drug overdose that occurred after an inmate swallowed a lethal dose of cocaine.

On November 8, 2019, the district court entered an order denying Bond's motion for leave to file a third amended complaint, concluding that it would be futile to grant the motion because the proposed complaint still did not allege sufficient facts to give rise to municipal liability. *Bond v. Nueces Cnty.*, No. 2:19-cv-43 (S.D. Tex. Nov. 8, 2019). The court stated that Bond had failed to allege that purported policies five (processing inmates for incarceration who should immediately receive medical attention) and nine

(failing to provide sufficient manpower to monitor inmates) had any causal connection to Tami's death, reasoning that Tami was not exhibiting cause for medical concern at the time of her initial booking and that Bond had not asserted that inadequate staffing had contributed to Tami's failing to receive medical care. *Id*. at 8. The court concluded that policies two (failing to provide immediate medical care as called for under the Texas Jail Standards) and twelve (failing to follow Texas Jail Standards regarding periodic cell checks of patients displaying overdose symptoms) detailed violations of state law, which could not support a § 1983 claim for the violation of federal rights. *Id*. at 8–9. Regarding the remaining alleged policies, the court found that the specific examples cited in the proposed complaint were insufficient to establish a persistent widespread pattern or practice. *Id*. at 11–12. It stated that Bond had not pleaded the incidents "similarly and specifically" as required in this circuit, citing *Peterson v. City of Fort Worth*, 588 F.3d 838, 850–51 (5th Cir. 2009). *Id*. at 11. And even if the incidents had been pleaded with adequate specificity to show similarity between them, the court continued, they would not demonstrate a persistent practice because Bond did not provide any statistics regarding how many total inmates are booked and complain of inadequate medical care or how this proportion compares to other jails or prisons. *Id*. at 12–13.

Because Bond did not provide "enough context to allow the Court to draw a reasonable inference that" the examples "were more than isolated events and amount to a pattern rising to the level of a policy," the district court concluded that she failed to allege the official policy or custom required to support municipal liability. *Id*. at 13–14. Finding that Bond had ample opportunity to amend her complaint to add additional facts, the court concluded that she had "pled her best case" and denied leave to amend, ordering that the claims against Nueces County remain dismissed. *Id*. at 14–15. Bond timely appealed.

No. 20-40050

## II.

This court reviews "motions to dismiss pursuant to Rule 12(b)(6) *de novo*, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Balle v. Nueces Cty., Texas*, 952 F.3d 552, 556 (5th Cir. 2017) (quoting *Ibe v. Jones*, 836 F.3d 516, 524 (5th Cir. 2016)) (internal quotes omitted). And while the denial of a motion to amend is generally reviewed for abuse of discretion, *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 347 (5th Cir. 2008), where, as here, the denial is based solely on futility, this court instead applies a *de novo* standard of review "identical, in practice, to the standard used for reviewing a dismissal under Rule 12(b)(6)." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010).

## III.

### A. Bond's Second Amended Complaint

The district court dismissed Bond's second amended complaint and denied her leave to file a third amended complaint in large part because it believed she had failed to adequately allege facts regarding specific previous incidents in which jail officials had failed to provide timely medical treatment when needed. Bond argues that this was error, as "boilerplate" allegations regarding the existence of an official policy are sufficient to survive the pleading stage under the Supreme Court's decision in *Leatherman v. Tarrant Cnty. Narcotics Intelligence Coordination Unit*, 507 U.S. 163 (1993). In *Leatherman*, the Supreme Court considered the propriety of the Fifth Circuit's "heightened pleading standard" for § 1983 cases against municipalities, which the Court described as "more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure." 507 U.S. at 164. However, since *Twombly* and *Iqbal*, this court has resumed applying the rule that a plaintiff must plead specific past instances to allege

10

No. 20-40050

municipal liability. *See*, *e.g.*, *Ratliff v. Aransas Cnty., Texas,* 948 F.3d 281, 285 (5th Cir. 2020); *Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018). Thus, while Bond's second amended complaint alleged that Nueces County maintained ten specific policies that caused jail officials to take or refrain from taking specific actions in particular situations, because it did not provide past examples of harm caused by these alleged policies, the complaint was deficient under binding circuit precedent. Because the district court did not err by dismissing Bond's second amended complaint for failing to state a claim, we AFFIRM.

### B. Bond's Proposed Third Amended Complaint

Bond's proposed third amended complaint, however, contained allegations of twenty-three specific prior incidents. As discussed *supra*, at this stage, Bond's proposed third amended complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Although Bond may be required to provide more detail regarding the alleged incidents to prove that a pattern exists after she has had the benefit of discovery, that question is not before us today. Accordingly, we determine that she stated a plausible claim that a municipal policy or custom was the moving force behind the alleged constitutional violations that led to Tami's death and conclude that the district court's denying leave to amend based on futility was error.

In determining the amendment would be futile, the district court found that the twenty-three specific examples listed by Bond in the proposed complaint failed to provide enough information such that the district court could determine whether the past incidents were like Tami's death. In doing so, the court cited *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009), which in turn quoted *Estate of Davis ex rel. McCully v. City of North*

11

*Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) for the rule that "a pattern requires similarity and specificity" and "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question" (alteration in original). Both *Peterson* and *Davis*, however, were cases that considered what is required to prove that a municipal policy or custom exists at the summary judgment stage, not what must be alleged at the pleading stage; both cases explicitly discussed what "evidence" must be introduced to *prove a pattern*, not what must be alleged to plausibly claim that a pattern exists. *See Davis*, 406 F.3d at 375.

Moreover, the discrepancies between the pattern evidence and the plaintiff's allegations in *Davis* were far greater than any differences that existed between the various incidents described in Bond's complaint.[3] In *Davis*, the court found that evidence a police officer had frequently indecently exposed himself in photographs and had yelled and acted disrespectfully in a traffic stop did not show a pattern of using excessive force where the estate of the plaintiff argued the officer had improperly shot and killed the plaintiff. *Id.* at 383–84. By contrast, here, Bond's proposed complaint noted that each of the cited incidents involved inmates who were refused timely medical attention when it was requested or the need was shown, resulting in injury or death—the precise basis of Bond's complaint regarding Tami's treatment.

The crux of Bond's proposed complaint is that Nueces County maintained a series of customs, practices, policies, or procedures related to "not providing timely and/or immediate medical care" that increased the magnitude of injury to in-custody individuals. While Tami's injury resulted

---

[3] *Peterson* simply cited *Davis* in *dictum* discussing the rule and ultimately did not determine that the prior incidents of excessive force demonstrated in that case were insufficiently similar. 588 F.3d at 851.

in death, not all circumstances that lead to preventable injuries had medical attention been timely provided are "life-threatening," nor does that articulation fairly represent Bond's proposed complaint ("[W]hat Plaintiff is alleging is that Defendants did not and do not provide immediate medical care when a significant medical situation arises and wait instead until such situation reaches a critical stage"). Taking reasonable inferences in favor of Bond, as we must at this stage, *see Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004), one can surmise that the alleged incidents are adequately similar to Tami's death because, like Tami, these individuals suffered injury due to the defendants' ignoring the significant medical needs of those entrusted to its care. Bond may be required to provide more detail regarding the prior incidents to prove that a pattern exists as the case continues, after she has had the benefit of discovery. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). At this stage, however, Bond has provided a series of examples with sufficient similarity to infer a pattern.

In determining the amendment would be futile, the district court also found that there was insufficient context within Bond's allegations because Bond did not provide any statistics regarding how many inmates were booked and received inadequate medical care or how this proportion compares to other jails or prisons. Though the court acknowledged that "not any one statistic is mandatory to include in the complaint," it appeared to fault Bond for "not includ[ing] any such statistics" and did not credit her statement that the listed incidents "represent only a small portion of the complaints and/or concerns with medical care at/in the Nueces County Jail." Aside from non-binding district court cases, however, the district court below and Nueces County on appeal relied only on circuit precedent that discussed the evidence that must be introduced at the summary judgment stage, not what must be alleged in an initial pleading. *See Peterson*, 588 F.3d at 851; *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002).

In *Peterson*, for example, the court found that evidence of twenty-seven excessive force incidents over the course of four years was not sufficient to establish that the City of Fort Worth had a policy of condoning excessive force at summary judgment absent "context as to the overall number of arrests or any comparisons to other cities." 588 F.3d at 851 n.4. The court repeatedly stated that what it was considering was *evidence* that a pattern, custom, or policy existed. *See id.* at 851. Specifically, the court stated that:

> The incidents allege use of force that, if true, would be emphatically excessive. Nevertheless, assuming their truth, the incidents do not, on the basis of this record, tell us that the City maintained an official policy of condoning excessive force. The failure of the evidence is that the plaintiffs have failed to provide context that would show a pattern of establishing a municipal policy.

*Id.* at 851–52. The court in *Peterson* assumed the truth of allegations supported by the evidence—the 27 complaints of excessive force that had been filed between 2002 and 2005—and concluded that there was insufficient evidence to show the context of the purported municipal policy. Indeed, the court held, based upon the evidence in the record, that "[n]o reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force." *Peterson*, 588 F.3d at 851 n.4. Concluding that the plaintiff's failure to contextualize the excessive force incidents contained within the record by showing "evidence of the department's size or the number of its arrests" was fatal at summary judgment is not another way of saying that allegations of a widespread custom of excessive force cannot establish a plausible inference of a constitutional violation at the hands of a municipality at the pleading stage. *Id.* at 852.

Similarly, the court's holding in *Pineda* that "[e]leven incidents each ultimately offering equivocal *evidence* of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces" does not mean a plaintiff is required to allege context in the form of precise numbers to state a claim against a municipality. 291 F.3d at 329 (emphasis added). There, the court concluded "the sample of alleged unconstitutional events is just too small[]" to create a genuine issue of material fact. *Id.* at 329. The court said "sample" because out of the "500 narcotics and search-related instances in 5000 offense reports" of allegedly unconstitutional searches produced by the City during discovery and provided to the parties' expert witnesses, "the district court considered only [the expert opinion evidence] accompanied by offense reports in the summary judgment record." *Id.* at 329, 331. That whittled the number down to thirteen, and the district court relied upon eleven of those thirteen reports. *Id.* at 329. Thus, the evidence in the record at the time of summary judgment—11 reports out of an initial 5,000—placed the plaintiff's allegations in context when the size of the city and force were taken into consideration.

Moreover, "[w]e have criticized defendants for arguing that cases dismissed on summary judgment supported dismissal of their cases at the pleadings stage." *Converse v. City of Kemah, Texas*, 961 F.3d 771, 776 n.3 (5th Cir. 2020) (citing *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 629 n.8 (5th Cir. 2018); *Drake v. City of Haltom City*, 106 F. App'x 897, 900 (5th Cir. 2004)); *see also Parker v. Blackwell*, 23 F.4th 517, 524, n.3 (5th Cir. 2022) (noting that the defendant relied on cases which were dismissed at the summary judgment stage, and reiterating that "at the Rule 12 stage. . . a plaintiff's burden is to simply allege 'sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" (internal citations omitted)). The question here is whether Bond has alleged enough to create a

No. 20-40050

reasonable inference that a policy exists, or that there exists a failure to have any pertinent policy. In contrast, the court in both *Peterson* and *Pineda* was concerned with what a "reasonable jury could conclude" based on the evidence introduced by a plaintiff after a reasonable opportunity for discovery. *Peterson*, 588 F.3d at 851 n.4. These cases do not support a requirement that to state a claim, a plaintiff must explicitly provide a denominator against which the allegations are weighed to determine the existence of a pattern. Indeed, in *Peterson,* the court said it was "assuming [the] truth" of the records (i.e., evidence) presented by plaintiff, rather than the truth of the allegations made in the complaint. 588 F.3d at 851.

A recent published decision of this court, *Balle v. Nueces County, Texas*, 952 F.3d 552, 559 (5th Cir. 2017), confirms that it is not necessary for a plaintiff to include statistics to sufficiently plead a claim for municipal liability. In *Balle*, the plaintiff alleged that jail officials in Nueces County did not provide him with medical care for his diabetes and back problems after he was kicked in the back during his arrest, nor during his subsequent six-day detention, notwithstanding his repeated requests for treatment and multiple apparent indications of medical concern. *Id.* at 555–56. The denial of medical care in that case, it was alleged, ultimately lead to the plaintiff undergoing surgery and losing the ability to walk. *Id.* There is no indication that the *Balle* plaintiff provided any statistics regarding the overall jail population in comparison to other jails, but this court affirmed that he had stated a claim for municipal liability by alleging a "pattern of failures" that occurred over the course of his time in custody. *Id.* at 560. Thus, even if we read cases like *Peterson* and *Pineda* to establish a requirement that the incidents alleged in a complaint constitute an appreciable portion of official conduct, *Balle* confirms that this fact can be reasonably inferred without being explicitly

16

alleged in an initial pleading—at least in a jail serving an area the size of Nueces County.[4]

Even if Bond had alleged statistics or a number of potential incidents, the twenty-three examples provided, "known only because of individual contact by such individuals with [Bond's attorney]," would still "represent only a small portion of the complaints and/or concerns with medical care at/in the Nueces County Jail." Tami's experience does not stand alone in the proposed complaint; to dismiss the case without permitting Bond the opportunity to seek records in defendant's possession that reflect a more accurate picture is to hold Bond to a standard too high at this stage of litigation when she has pleaded numerous alleged incidents of inadequate medical care.

The district court's remaining rationales for discounting several of the specific policies Bond alleged in her proposed third amended complaint are also flawed. The court stated that purported policies five (processing inmates for incarceration who should immediately receive medical attention) and nine (failing to provide sufficient manpower to monitor inmates) did not have any causal connection to Tami's death because Tami was not exhibiting cause for medical concern at the time of her initial booking and Bond did not assert that inadequate staffing contributed to Tami's failing to receive

---

[4] This case concerns only the population of a jail—not the whole county—in a county with a total population of only about 360,000 people. *See* United States Census Bureau, Quick Facts – Nueces County, https://www.census.gov/quickfacts/ nuecescountytexas. This is a considerably smaller denominator than was at issue at the summary judgment stage in *Peterson* and *Pineda*. *Cf. Peterson,* 588 F.3d at 851 (discussing police activity in Fort Worth, which had a population of approximately 900,000, *see* United States Census Bureau, Quick Facts – Fort Worth City, Texas, https://www.census.gov/quickfacts/fact/table/fortworthcitytexas) and *Pineda*, 291 F.3d at 329 (discussing police activity in Houston, which had a population of approximately 2,300,000, *see* United States Census Bureau, Quick Facts – Houston City, Texas, https://www.census.gov/quickfacts/fact/table/houstoncitytexas).

medical care. But one can infer that jail officials were aware that Tami had swallowed the baggies when they conducted her initial booking—and thus that their alleged decision to incarcerate her rather than provide her emergency medical care contributed to her death—from the facts that Tami was arrested for tampering with evidence by ingesting narcotics, that guards entered the holding cell and searched it for narcotics, and that officers knew she was hallucinating and displaying other concerning symptoms. Bond also alleged that jail officials did not conduct the 15-minute-watch monitoring that the Texas Jails Standards prescribed for inmates in isolation, and one can infer that such a failure to comply with the Standards caused or contributed to Tami's death.

The district court also concluded that policies two (failing to provide immediate medical care as called for under the Texas Jail Standards) and twelve (failing to follow Texas Jail Standards regarding periodic cell checks of patients displaying overdose symptoms) detailed violations of state law, and therefore could not support a § 1983 claim for the violation of federal rights. But this misconstrues Bond's allegations. Bond does not assert that she is entitled to relief simply because jail officials disregarded Texas state law. Rather, Bond argues that jail officials had a custom of disregarding state law that was so persistent and widespread as to constitute a municipal policy, and their adherence to this "policy" of disregarding state law was the "moving force" behind a violation of Tami's federal constitutional rights. *Monell*, 436 U.S. at 694; *cf. Balle*, 952 F.3d at 560 (finding that jail officials' pattern of defying state law that required them to implement procedures to provide medical treatment to inmates efficiently and promptly in acute and emergency situations constituted a policy for purposes of § 1983 municipal liability claim). That the allegations involve violations of state law is incidental; the salient question is whether Bond has alleged a practice "so common and well-settled as to constitute a custom that fairly represents

municipal policy." *Peterson*, 588 F.3d at 847; *cf. Louise B. v. Coluatti*, 606 F.2d 392, 399 (3d Cir. 1979) ("To put the matter more bluntly, where a state violates federal law, it is no better off because it also violates its own law.").

*Twombly* and *Iqbal* require us to discount conclusory allegations in a complaint that amount to a recitation of the elements of the legal claim, then consider whether the facts that remain state a plausible claim for relief. *Twombly,* 550 U.S. at 555; *Iqbal*, 556 U.S. at 680. Here, that means removing from our consideration of Bond's proposed third amended complaint any bare statements that jail officials acted in accordance with a policy maintained by Nueces County when they allegedly violated Tami's constitutional rights. But a wealth of factual allegations regarding acts attributable to Nueces County remain when these statements are excised from Bond's proposed third amended complaint, including that County jail officials routinely failed to identify or address the medical needs of inmates in a timely manner, that they had decided not to implement the Texas Commission on Jail Standards' recommendations for providing efficient and prompt medical care in acute and emergency situations, that the County provided no official training on how to identify and address inmates exhibiting cause for medical concern, that persistent inadequate staffing had led to insufficient monitoring of inmates and their medical needs, and a host of other alleged widespread patterns or practices. And the proposed complaint alleged that Nueces County had failed to act to correct these patterns or customs despite the County's being aware that they had caused injury or death on at least twenty-three specific past occasions. These allegations are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Accordingly, the district court erred by denying Bond leave to amend on the ground that amendment would be futile.

## IV.

Based on the foregoing, we AFFIRM the dismissal of Bond's Second Amended Complaint, VACATE the district court's denial of leave to amend, and REMAND the case for further proceedings consistent with this opinion. We express no view as to what decisions the district court should make on remand.